UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

DANILO CURBELO GARCIA, individually,
MAYLEN TURRUELLAS, his wife, and
YUNIS CURBELO, their daughter.                    Civil Action No._____

    Plaintiff,                                    **COMPLAINT**

v.                                                JURY TRIAL DEMANDED

AROLDIS CHAPMAN a/k/a ALBERTIN
AROLDIS CHAPMAN DE LA CRUZ,
individually, and JUAN ALBERTO
CHAPMAN BENETT, individually.

    Defendants.
_____/

    Plaintiffs, by and through the undersigned counsel, the LAW OFFICES OF AVELINO J. GONZALEZ, P.A., complaining of the Defendants, respectfully allege upon information and belief as follows:

## INTRODUCTION

    This is an action seeking damages for prolonged arbitrary detention and torture of Plaintiff committed by defendants AROLDIS CHAPMAN a/k/a ALBERTIN AROLDIS CHAPMAN DE LA CRUZ ("CHAPMAN") and JUAN ALBERTO CHAPMAN BENETT ("BENETT"), his officers, directors, agents, servants and employees, acting in concert with, aiding, abetting, facilitating, soliciting, directing, orchestrating and conspiring with the Cuban government and its collaborators in the commission of these acts, in violation of the Law of Nations, the laws of the United States of America and of the individual states, including but not limited to the State of Florida.

## JURISDICTION

    1.    The Court has subject matter jurisdiction over this case under the Alien Tort Claims Act (ATCA) 28 U.S.C. § 1350 and the Torture Victim Protection Act of 1991 (TVPA) 28 U.S.C. § 1350, note,§ 2(a) and 28 U.S.C. § 1331 (Federal Question Jurisdiction), and 28 U.S.C. § 1332 (diversity jurisdiction). Plaintiffs also invoke the supplemental jurisdiction of this Court

with respect to claims based upon the laws of the State of Florida and/or any other applicable jurisdiction pursuant to 28 U.S.C. § 1367.

2.      Plaintiff DANILO CURBELO GARCIA ("CURBELO GARCIA") is a citizen of the Republic of Cuba and a legal Permanent Resident of the United States.

3.      Plaintiff MAYLEN TURRUELLAS MENDEZ ("TURRUELLAS") is a citizen of the Republic of Cuba, who was granted Adjustment by the United States Immigration Services and is a citizen of the United States residing in the Miami, Florida.

4.      Plaintiff YUNIS CURBELO ("CURBELO") is a citizen of the Republic of Cuba, who was granted Adjustment by the United States Immigration Services and is a citizen of the United States residing in the Miami, Florida.

5.      Defendant CHAPMAN is a United States Permanent Resident, whose permanent residence is 2390 S.W. 106th Terrace, Davie, Florida 33324.

6.      Defendant BENETT is a Cuban citizen, who permanently resides in El Polo, Frank Pais municipality, Holguin, Cuba.

7.      The amount in controversy, both individually and collectively, exceeds $75,000.

## THE PARTIES

8.      Plaintiff CURBELO GARCIA is a Cuban citizen, who is serving a 10-year prison sentence in Cuba, under inhumane conditions, for a crime he did not commit because of Defendants' false denunciation to officials from the repressive Cuban *Departamento de Seguridad del Estado,* Department of Security of the State, (herein after "DCSE") and because of the false testimony Defendants presented against Plaintiff at a sham trial, which followed no rules of evidence or due process, and which was deliberately skewed against Plaintiff. Plaintiff's treatment in prison is cruel, degrading, unsanitary, and tortuous.

9.      Plaintiff TURRUELLAS MENDEZ is a citizen of both Cuba and the United States, living in Miami-Dade, Florida; she is married to Plaintiff CURBELO GARCIA and, as a result of Defendants' tortious actions in contravention of the laws of nations, she has suffered loss of consortium as well as emotional distress.

10.     Plaintiff CURBELO is a citizen of both Cuba and the United States, living in Miami-Dade, Florida, with her mother, Plaintiff TURRUELLAS MENDEZ. Her father is Plaintiff CURBELO GARCIA, and as a result of Defendants' tortious actions in contravention of the laws of nations, she has suffered loss of parental consortium, as well as emotional distress.

11.     At all times hereinafter mentioned, CHAPMAN was and is an internationally acclaimed baseball player, and a Cuban citizen, who defected from Cuba in 2009, has since been retained by the Major League Baseball team, the Cincinnati Reds, to play in the position of pitcher, and who maintains a permanent residence in Davie, Florida.

12.     At all times hereinafter mentioned, BENETT was and is CHAPMAN's father and a Cuban citizen, who resides in Cuba.

13.     Upon information and belief and at all times relevant herein, CHAPMAN conspired with named and unnamed agents of the repressive DCSE and with the Cuban government to violate the laws of nations by committing arbitrary and prolonged detention and torture of Plaintiff CURBELO GARCIA.

14.     Upon information and belief and at all times relevant herein, BENETT conspired with unnamed agents of the repressive DCSE and with the Cuban government to violate the laws of nations by committing arbitrary and prolonged detention and torture of Plaintiff CURBELO GARCIA.

15.     Upon information and belief and at all times relevant herein, CHAPMAN aided and abetted unnamed agents of the repressive DCSE and with the Cuban government to violate the laws of nations by committing arbitrary and prolonged detention and torture of Plaintiff CURBELO GARCIA.

16.     Upon information and belief and at all times relevant herein, BENETT aided and abetted unnamed agents of the repressive DCSE and with the Cuban government to violate the laws of nations by committing arbitrary and prolonged detention and torture of Plaintiff CURBELO GARCIA

## VENUE

17.     Venue is proper in the Southern District of Florida pursuant to 28 USC § 1391 (a) and (b) in that this is the judicial district in which a substantial part of the events or omissions

giving rise to the claim occurred and Defendant CHAPMAN maintains a permanent residence in the state of Florida.

## ALLEGATIONS OF FACT COMMON TO ALL COUNTS

The following allegations of fact are made upon information and belief, derived from Cuban public documents, from the DCSE declaration and the court testimony of CHAPMAN and his father, BENETT, in Cuban court, from witness testimony given in Cuban court, and eye-witness accounts of the events as they occurred, and from filed Court documents in the Republic of Cuba.

18.     The Defendants tortiously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently caused and/or otherwise proximately caused the arbitrary and prolonged detention and torture of CURBELO GARCIA and/or injuries to TURRUELLAS MENDEZ and to CURBELO.

19.     The Defendants aided and abetted the DCSE and the Cuban government in tortiously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently and/or otherwise proximately causing the arbitrary and prolonged detention and torture of CURBELO GARCIA, and/or injuries to TURRUELLAS MENDEZ and to CURBELO.

20.     The Defendants conspired with the DCSE and the Cuban government in tortiously, intentionally, willfully, wantonly, maliciously, knowingly, recklessly and negligently and/or otherwise proximately causing the arbitrary and prolonged detention and torture of CURBELO GARCIA, and/or injuries to TURRUELLAS MENDEZ and to CURBELO.

21.     The Defendants initiated, solicited and facilitated the arbitrary and prolonged detention by CURBELO GARCIA and/or injuries to TURRUELLAS MENDEZ and to CURBELO.

22.     The Defendants acted with the intent to assist in the violations of international law(s) by the DCSE and the Cuban government and initiated and cooperated with them to assist in said violations.

23.     The Defendants' acts had a substantial effect upon the success of the acts of the DCSE and the Cuban government and their violation of international law(s).

24.     The Defendants had actual and constructive knowledge that their acts assisted in the violations of international law(s) by the DCSE and the Cuban government.

<u>EVENTS LEADING UP TO PLAINTIFF'S ARBITRARY ARREST</u>

25.     CURBELO GARCIA was an expatriated Cuban Citizen, who was living in the United States. He traveled to Cuba on July 18, 2008 to visit his family, neighbors and friends. From July 18, 2008 until the date of his arrest on July 30, 2008, CURBELO GARCIA had been staying in the home of his parents, mother Delsa Garcia Gomez and father Mauret Curbelo Diaz. During his stay, his family, friends and neighbors had enjoyed themselves, drinking rum, socializing and catching up.

26.     On July 25, 2008, during a mandatory party organized the *Comité* de *Defensa de la Revolución*, Committee for the Defense of the Revolution, (hereinafter "CDR") CURBELO, who was present accompanying his parents since they were required to attend, entered into conversation with a friend and neighbor named Alejandro Manuel Medina Aguilera ("MEDINA"). During their conversation, they chanced upon a discussion of CHAPMAN's attempt to escape from Cuba some months before CURBELO GARCIA's visit, and how CHAPMAN was barred from participating in the 2008 Olympic games at Beijing, China as a result. It was during this exchange that MEDINA informed CURBELO GARCIA that MEDINA knew CHAPMAN socially and could introduce him to CHAPMAN, to which CURBELO GARCIA happily agreed.

27.     MEDINA, whose nickname is "HABANA", asked CURBELO GARCIA to drive him to Frank Pais so that MEDINA could collect sixty Cuban pesos ($60) that a man named Magnolis owed him for a pair of shoes that MEDINA had sold Magnolis. MEDINA told CURBELO GARCIA that while they were in Frank Pais, they could pass by CHAPMAN's home and CURBELO GARCIA would be able to meet him.

28.     CURBELO GARCIA drove MEDINA to Frank Pais, driving his father's car, a Moskvitch, a soviet era car, and to CHAPMAN's house, where only MEDINA exited the car and went into the house, whereupon he spoke with CHAPMAN and his family, who were present in the house. They spoke inside the house for approximately half an hour; CHAPMAN informed him that he was already training to play baseball again, and MEDINA asked CHAPMAN if he

5

knew a man named Magnolis, who owed him money for the shoes MEDINA sold him, and when CHAPMAN answered in the negative, MEDINA told him that he had to leave.

29.     MEDINA returned to the car without Chapman, who CURBELO GARCIA had been waiting to meet, and, without knowing the whereabouts of Magnolis, they decided to return to Holguin, with CURBELO GARCIA stating that if he had known that he was not going to meet with the famed baseball player, he wouldn't have wasted the trip to Frank Pais and just given MEDINA the sixty Cuban pesos ($60) that were owed to him.

30.     On the following day, July 29, 2008, CURBELO GARCIA rented an Audi A4, intending to drive to Havana the next day to visit his wife's relatives. On that day, he and MEDINA used the Audi A4 to travel to the nearby municipality of Mayari, Cuba, where CURBELO GARCIA had some friends. During that visit, CURBELO GARCIA's friends asked him if he could transport their friends, a woman and a young girl, to Frank Pais. He agreed and drove them there just as the sun was setting.

31.     In Frank Pais, after dropping off his passengers, the woman and the girl, near a military committee office, MEDINA said he saw CHAPMAN riding on a bike, and suggested they go to the location he appeared to be heading so that CURBELO GARCIA could meet CHAPMAN.

32.     Failing to locate CHAPMAN, they were on their way back to the car to return to Holguin when MEDINA again spotted CHAPMAN heading toward them on his bicycle. They met approximately one hundred feet from the police station in Frank Pais, where MEDINA introduced CHAPMAN to CURBELO GARCIA.

33.     CHAPMAN and CURBELO GARCIA spoke for a few minutes, when CURBELO GARCIA asked the famous baseball player when he would be leaving the country, to which, CHAPMAN responded that he had learned his lesson from his earlier attempt to leave and that he never intended to leave Cuba. CURBELO GARCIA told him that in the United States major league baseball players, who were not as good as CHAPMAN, were making millions of dollars. At that point MEDINA told CURBELO GARCIA to stop "eating shit", which effectively put an end to his conversation with CHAPMAN.

34.     MEDINA then continued to speak with CHAPMAN for a few more minutes while CURBELO GARCIA walked some distance away.

35.     On the way out of Frank Pais, an officer from the Revolutionary Police for the Department of Interior, signaled for CURBELO GARCIA and MEDINA to step out of the car and to search the vehicle and their persons and papers. Finding nothing of interest, they were allowed to continue to Holguin.

36.     The next day, July 30, 2008, he was arrested and put into prison.

PLAINTIFF'S ARBITRARY AND PROLONGED ARREST AND DETENTION

37.     On July 30, 2008 CURBELO GARCIA was in his home of Holguin, Cuba, staying with his parents', when officials from the DCSE arrested him and took him away without informing him, his family, or anybody else where they were taking him or why he was being taken away. The government held him in prison in Holguin for 12 days, transferred him to Villa Marista prison in Havana without notice to him or his family for several more days to investigate Defendants' allegations against CURBELO GARCIA, and then returned him in the Holguin prison without informing him of what he was charged.

38.     After returning from Villa Marista in Havana, Plaintiff pleaded with his parents to find an attorney and discover the charges against him. His parents attempted to glean any information about their son's case, even requesting a meeting with the Chief Prosecutor for the Province, Pedro Pablo Cutiño Diéguez, who replied to their repeated entreaties by stating in one of their many visits that "if the Five Heroes [referring to five Cuban nationals, Gerardo Hernández, Ramón Labañino, Antonio Guerrero, Fernando González and René González, who in 2001 were convicted of espionage in a U.S. federal court] were still waiting so many years, it was of no consequence that you should wait longer".

39.     While in detention CURBELO GARCIA was interrogated at frequent and sporadic intervals, at any time of the day or night, and was never advised that he could have an attorney present at such interrogations.

40.     In detention CURBELO GARCIA was kept in constant discomfort, never fully being able to relax or to sleep, as guards would wake him when they saw him drift off. Officials

did not give him any information about why he was being held, nor was he brought before a tribunal, judge or hearing officer or offered bail.

41.     After approximately 4 months of being held in prison without charges or any information about his situation, Plaintiff CURBELO GARCIA's father finally sent a letter written by CURBELO GARCIA to Havana, to which officials in that city replied that CURBELO GARCIA was still being investigated for the crime of human trafficking and that a trial against him would be held in the month of December in the municipality of Moa.

42.     The trial date in December was postponed, but neither CURBELO GARCIA nor his family were informed of that change until the trial was upon them.

43.     The trial was finally held on January 21, 2009, almost six months after CURBELO GARCIA's arrest, having never come before a judge nor having had formal charges brought against him before the date of trial.

THE DEFENDANTS' DECLARATIONS AND TESTIMONIES

44.     During CURBELO GARCIA's trial, both BENETT and CHAPMAN contradicted the declarations they had made to the DCSE on July 31, 2008.

45.     During his DCSE declaration CHAPMAN reported an elaborate plan, where he claims that CURBELO GARCIA, after having sought a meeting with him over several days, finally met CHAPMAN for the first time on July 29, 2008 in the central plaza in the nearby city of Frank Pais, where he claims that CURBELO GARCIA offered to surreptitiously take CHAPMAN by car from Frank Pais to an undisclosed safe house outside of Holguin province, he would then transfer CHAPMAN to another house, from where they would drive by car to a beach in Havana, where, according to CHAPMAN, they would have to do much walking to reach a location on the beach, where a motorboat would take CHAPMAN out of the country.

46.     CHAPMAN's declaration states that he first met CURBELO GARCIA on July 29, 2008 and described his physical appearance as that of a Caucasian man of medium height.

47.     CHAPMAN stated in his declaration that CURBELO GARCIA assured CHAPMAN on July 29, 2008 that he had the entire thing planned out and that CHAPMAN would be well paid by an uncertain dollar amount, while he, CURBELO GARCIA, would only

get a percentage of whatever CHAPMAN was paid once CHAPMAN was contracted in the United States.

48.    CHAPMAN declared to DCSE that on the night before the meeting in Frank Pais, a couple of men, one of who was an acquaintance of CHAPMAN, known as HABANA (referring to MEDINA), had visited him at his home for a social call before heading off to find another man, whose name CHAPMAN could not remember and to go buy a telephone. CHAPMAN declared that the men chatted with him inside the house for about fifteen (15) minutes, before he walked outside with them to stand on the porch and chatted a few more minutes. He declared that there was another man in the car parked at the curb, but that he could not identify him. He did not report that any offers were extended to him that night, nor did he indicate that anybody approached him about leaving the country

49.    At trial CHAPMAN first stated that he didn't remember anything that happened on those nights, but after guidance and prompting from the prosecution, he spun a tale that was vastly different than the one he supplied in his DCSE declaration, but which never-the-less implicated CURBELO GARCIA of attempting to smuggle CHAPMAN out of the country.

50.    Despite having specifically stated in his declaration that he had not met the person waiting in the car, and despite stating specifically that he had not met CURBELO GARCIA until July 29, 2008 in Frank Pais, CHAPMAN contradicted his own declaration by claiming that he walked up to the car that HABANA (referring to MEDINA) had been riding in on July 28, 2008, the night he visited CHAPMAN's house, and that CHAPMAN talked to CURBELO GARCIA, who, spoke with CHAPMAN about having the telephone number of Dayan Viciedo ("Viciedo"), a different Cuban baseball player, and that he wanted to call Viciedo from CHAPMAN's house the next day, but that he never came to his house. According to his trial testimony CURBELO GARCIA did not offer to take CHAPMAN out of the country that night.

51.    While BENETT's July 31, 2008 declaration concurs with that of his son's as to the visit by HABANA (referring to MEDINA) and his unnamed companion to the house, the rest of the declaration differs from CHAPMAN's in various startling respects.

52.    BENETT declared to the DCSE that after his son returned inside their house after having walked the men outside, CHAPMAN told his father that the man known as HABANA (referring to MEDINA) had offered "to leave the country [Cuba] together [with CHAPMAN],

that everything had been planned out, that there was a man, who would come to pick him up and get him out and that he [HABANA] would leave also, that the contract for him [CHAPMAN] to play baseball was already guaranteed and that they would pay him well, that according to Aroldis [CHAPMAN] the man [HABANA a/k/a MEDINA] would come and pick him up on the following day, Tuesday." This is totally at odds with CHAPMAN's declaration, where he stated that he was not made any offers.

53.     In the declaration, BENETT describes the physical appearance the men, who visited his son at his home. He described the man who was CHAPMAN'S acquaintance [HABANA a/k/a MEDINA] as a short, stocky, black man, and he described the other man as being a slightly taller, slightly thinner dark man.

54.     BENETT further declared that CHAPMAN told him on Monday July 28, 2008, that CHAPMAN intended to "call the official [of the DCSE] whose number he knows the next morning to inform him of the situation."

55.     BENETT offered his accounting to DCSE of how CHAPMAN described the person, who was offering to smuggle him out of the country, after he met the man in Frank Pais on July 29, 2008, the day following the visit to the Chapman house. BENETT declared that CHAPMAN told him that the man who was offering to smuggle him out of the country [presumably CURBELO GARCIA] was a tall white man, by contrast to the ones who visited the night before.

56.     At trial BENETT contradicted his earlier declaration by testifying that CURBELO GARCIA, which is described in all police, court documents, and by CHAPMAN, as a white man, was the man who accompanied CHAPMAN's acquaintance to visit CHAPMAN at his house the night before CHAPMAN met him in Frank Pais, despite having described in his own declaration that the man who accompanied HABANA was a dark man, and despite his earlier declaration that CHAPMAN had told him that the man he met in Frank Pais was a white man, and a different person than the one who visited his house.

57.     At trial, BENETT reiterated his earlier assertion, which contradicted CHAPMAN's testimony and declaration, that his son told him that the people who visited him on July 28, 2008 had offered to smuggle him out that very night.

58.     The declaration and testimony of BENETT, and the testimony of CURBELO GARCIA, CURBELO GARCIA's family, his neighbors, and MEDINA (described by CHAPMAN as "HABANA"), the only eye witness to the one and only conversation CURBELO GARCIA had with CHAPMAN on July 29, 2008, contradicted CHAPMAN's testimony.

## THE SHAM TRIAL

59.     Just before the trial commenced, a messenger reported to CURBELO GARCIA's mother that Miguel Diaz Canel Bermudez, who at that time was First Secretary of the Communist Party for Holguin Province and who was later promoted in April 2009 to Minister of Higher Education, stated, "This conviction cannot escape from our grasp."

60.     The trial was attended by CURBELO GARCIA's parents, his extended family, and his neighbors.

61.     The Cuban government was trying CURBELO GARCIA for human trafficking under Title 15, Article 347-2 of the Cuban Penal Code, which states that "the same penalty (imprisonment from seven to fifteen years) will be incurred by any person who, without being authorized to do so and for profit, organizes or promotes exit from the national territory of people who are in it to third countries.

62.     The only evidence produced by the prosecution against CURBELO GARCIA was the testimony of CHAPMAN and that of his father, BENETT, whose own testimony contradicted CHAPMAN's, and whose information he openly claimed was derived from what CHAPMAN himself had told him.

63.     Both BENETT and CHAPMAN contradicted their earlier declarations, as well as each other's testimonies and CHAPMAN emphatically declared in open court that he had no intention of ever leaving Cuba.

64.     CURBELO GARCIA, on the other hand, presented the testimony of various witnesses in his defense, including that of Lieutenant Luis Quesada Parra ("PARRA"), the leading police investigator for the DCSE in charge of investigating the case.

65.     PARRA testified that no evidence had been found to corroborate CHAPMAN and BENETT's accusations against CURBELO GARCIA.

66.     PARRA testified that there was no evidence of any plans to leave the country illegally, and that even if CHAPMAN had accepted any such offer, that no flight would have been effectuated because no plans had been put into place.

67.     PARRA testified that there was no evidence to indicate that MEDINA (described by CHAPMAN as "HABANA") had called CHAPMAN, as he claimed.

68.     PARRA testified that CURBELO GARCIA had always been consistent in all of his interviews, and that he believed that CURBELO GARCIA had been sincere throughout the investigation.

69.     During the five-minute recess directly following PARRA's testimony, the prosecuting attorney, Kenia Perez, approached PARRA and threatened him by telling him to "mind the consequences."

70.     The testimony of MEDINA, who was the only eye-witness present during CHAPMAN's conversation with CURBELO GARCIA, challenged the Defendants' version of events.

71.     MEDINA testified that CURBELO GARCIA met CHAPMAN on the night of July 29, 2008 in Frank Pais, where he spoke for approximately two minutes with CHAPMAN, and where CURBELO GARCIA asked CHAPMAN when he would leave the country, to which CHAPMAN replied in a manner that MEDINA thought sounded aggravated, at which point MEDINA told CURBELO GARCIA to stop "eating shit", which ended CURBELO GARCIA's conversation with CHAPMAN.

72.     MEDINA's testimony at trial coincided with CHAPMAN's DCSE declaration in describing the visit to CHAPMAN's house on July 28, 2008. MEDINA testified that he convinced CURBELO GARCIA to drive him to Frank Pais to collect some money that was owed to him by  a man to whom he had sold a pair of shoes. MEDINA testified that he told CURBELO GARCIA that he would introduce him to CHAPMAN during that trip, but that when he arrived at CHAPMAN's domicile, MEDINA went inside the house, and CURBELO GARCIA waited in the car at all times during that visit and did not meet CHAPMAN, who never approached the vehicle. MEDINA further testified that CURBELO GARCIA grumbled to him

that if he had known that he was not going to meet CHAPMAN, he would have simply paid MEDINA the money that was owed to him.

73.     CURBELO GARCIA presented testimony in his own defense that was substantially similar to MEDINA's, stating that, while he went to CHAPMAN's domicile on July 28, 2008, he waited inside the car, and did not meet CHAPMAN until the next night, July 29, 2008, in Frank Pais. CURBELO GARCIA further testified that he simply asked CHAPMAN when he intended to leave Cuba, and when CHAPMAN had told him that he had learned his lesson from a previous escape attempt and never intended to leave Cuba, CURBELO GARCIA told him that in the United States, there were major league baseball players, who were not as good as CHAPMAN, who were getting paid millions of dollars. At that point, MEDINA (described by CHAPMAN as HABANA) told him to stop "eating shit", which put an end to his conversation with CHAPMAN.

74.     Once all of the testimony had been presented, CURBELO GARCIA's attorney, CARLOS MANUEL PEREZ LEYVA ("PEREZ") summarized the Cuban government's dearth of evidence in trying CURBELO GARCIA. The state had not produced any evidence as to any plan effectuated by CURBELO GARCIA to effectuate CHAPMAN's exit from Cuba or had not produced any evidence as to any profit gained from such a plan, the lead investigator on the case believed that CURBELO GARCIA had not committed the crime, and the government's two witnesses, CHAPMAN and BENETT, gave testimony that was inconsistent and contradictory.

75.     Once the parties had rested, PARRA and CURBELO GARCIA's attorney, PEREZ, congratulated him and told him that he was as good as free.

76.     When the tribunal returned, they rejected all of the evidence presented in CURBELO GARCIA's defense and unilaterally condemned him based solely on CHAPMAN and BENETT's testimony, specifically citing CHAPMAN's athletic ability and his position on the Cuban National baseball team.

77.     CURBELO filed an appeal, which was denied on December 9, 2009 for failure to present any new evidence in the matter.

78.     There are no further appeals or legal recourses CURBELO can make inside Cuba to redress his situation.

## TORTURE

79.     Because CURBELO GARCIA had expatriated, specifically to the United States, the Cuban government has subjected CURBELO GARCIA to the treatment reserved for enemies of the state, rather than those reserved for common criminals.

80.     From the outset, the government has treated CURBELO GARCIA as a Cuban citizen when it was convenient and as a foreigner when it did not suit its purposes.

a.   Like foreigners, he was forced to pay for his attorney using United States' dollars, rather than Cuban pesos as all citizens are allowed, which drastically increased the cost of his defense.

b.   Unlike foreigners, he was not allowed to visit a foreign consulate, nor is he allowed extradition.

c.   Like foreigners, he was transferred without notice to a prison in Granma, which is outside of Holguin and far away from his family, unlike the customary treatment for Cuban citizens, which is to leave them in the province where their families reside.

d.   Unlike foreigners, he is held with general population, rather than the prisons designated for foreigners.

81.     In prison, CURBELO GARCIA has had to suffer the following:

a.   Random beatings

b.   Punishment of Solitary confinement in dank, windowless cells that he shares with rats and roaches and which have no mattresses or blanket when family members have complained about his treatment, his living conditions, or his sudden transfers.

c.   Being fed food that is spoiled, rotting, and covered in maggots.

d.   Prolonged deprivation of sun and open air for up to six months at one time.

e.   Regularly confined for twenty three (23) hours a day in a 4 foot by 6 foot prison cell with up to five other prisoners to the point where his skin became mottled and blotchy.

f.   Unsanitary conditions, where four to six men share the same cramped hot cell, are fed rotting food, and must relieve their bowels and bladders in a hole on the ground of the cell. No toilet paper, sanitary napkins or even scraps of cloth are provided.

g.   Denied adequate medical care, despite being a very sick man.

h.   Allowed visitors for only one hour every month.

i.   Confiscation of food or treats brought to him by his family.

j.   Arbitrary transfers to a prison in a different prison away from his family, who are the only ones that supply him with whatever inadequate medication they can gather to treat his medical conditions.

82.   CURBELO GARCIA is a very sick man, who has hypertension and renal failure. Since the prison does not have the ability or the inclination to treat his ailments, CURBELO GARCIA depends on his mother to bring him any medication that she is able to scavenge or barter for on the streets in order to treat his high blood pressure. Even though the medications may not be adequate for his condition, they are the only thing keeping him from dying. At one point he had a sustained systolic blood pressure level of 270 for a week due to the lack of medication.

83.   More than a year and a half after his incarceration CURBELO GARCIA's wife, TURRUELLAS MENDEZ, was finally able to visit him in prison for an hour and fifteen minutes. She was shocked at his transformation. He had lost more than sixty (60) pounds, his hair had gone gray apparently overnight, his skin was stained and mottled, he had what appeared to be liver spots on his hands, his lips were dry and cracked, he had a sustained fever, which he had had for several days, and he shivered uncontrollably.

84.   It was only after TURRUELLAS MENDEZ complained loudly and threatened to take this treatment to the International press that the prison officials admitted CURBELO GARCIA into the prison infirmary, where he remained for three days.

85.   On at least two (2) separate occasions, officials from the Ministry of the Interior and the Department of Immigration have visited him in prison and have told him that his situation and treatment would vastly improve if he signed an agreement to repatriate, to which CURBELO GARCIA said no.

<u>CHAPMAN'S DEFECTION</u>

86.     CHAPMAN attempted to illegally flee Cuba in March 2008. He was stopped by police in that country before he could carry out his plan.

87.     Athletes, who attempt to flee the island, are generally removed from the National Team and suspended from the National Series for a period of two years. Other Cuban baseball superstars, like Yadel Marti and Yasser Gomez, were suspended from the National Team and the National Series when they tried to defect in November 2008, and extraordinary players like Orlando "El Duque" Hernandez ("El Duque"), received a lifetime suspension for simply accepting money from an American agent.  El Duque had previously been suspended from both the National Team and National Series simply because his brother, Livan Hernandez (also a major league baseball player) had defected.

88.     But in CHAPMAN's case, he was taken to his own home, before being escorted to Havana in order to meet and speak with Raul Castro, the Cuban president, who miraculously gave CHAPMAN a conditional reprieve, by personally suspending CHAPMAN only for the remainder of the National Series season and removed him from the National team that was traveling to Beijing for the Olympics.

89.     Despite the alleged suspension personally handed down by President Castro, CHAPMAN was allowed to return to the National Series team in August, shortly after his declaration against CURBELO GARCIA, and he rejoined the national team when Cuba announced the National roster in early January 2009 for the World Baseball Classic, which was held in Mexico and in which CHAPMAN pitched for Cuba in March 2009.

90.     CHAPMAN fled from Cuba while traveling to Holland with the Cuban National Team to participate in the World Port Tournament on July 1, 2009, less than six (6) months after testifying in CURBELO GARCIA's trial.

91.     Despite his court testimony about having no intention of leaving the country, CHAPMAN told the international press in July 2009, right after his defection, that from the moment of his first failed escape attempt, he became more determined to leave the country and he made the conscience decision to do everything he could to escape, that he would remain loyal

to the government until his perfect day arrived, and that "it was a plan that I had, a decision that I made".

92.     His decision to leave the country led to his methodical subterfuge, which centered on demonstrating his loyalty to the state, which he accomplished by becoming an informant for the DCSE, and falsely reporting and testifying against CURBELO GARCIA.

CUBAN POLICIES DEALING WITH CUBAN-AMERICANS

93.     According to the Department of State's Bureau of Consular Affairs, Cuba maintains a totalitarian state, which relies on repressive methods control over the population, including severe physical and electronic surveillance as well as arbitrary detentions and arrests.

94.      Cuba does not recognize the Dual Nationality or Residency of U.S. Citizens or residents born in Cuba, and the Bureau of Consular Affairs warns Cuban-American citizens, who travel to Cuba, that the travelers will be treated as a Cuban citizens, subject to Cuban laws.

95.     The Bureau of Consular Affairs further warns Cuban-Americans that, as travelers to Cuba, they may even have their passports confiscated, be forced to apply for permission to exit the country, or even be compelled by authorities to sign repatriation documents and will be denied U.S. consular services if arrested.

96.     Cuban-Americans traveling to Cuba are subjected to inconsistent treatment, where they reside in a legal limbo, exposed to the same kind subjugation as all other Cuban citizens, but denied any of the privileges other Cubans enjoy, such as free healthcare and attendance within the Cuban hospitals provided for its citizens.

CUBAN PRACTICES OF ARREST AND IMPRISONMENT

97.     The Ministry of Interior is the principal entity of state security and totalitarian control. Officers of the Revolutionary Armed Forces (FAR) have been assigned to the majority of key positions in the Ministry of Interior in the past several years. In addition to the routine law enforcement functions regulating migration, controlling the Border Guard, and the regular police forces, the Interior Ministry's Department of State Security investigates and actively suppresses political opposition and dissent. It maintains a pervasive system of surveillance through undercover agents, informants, rapid response brigades (RRB's), and neighborhood-based Committees for the Defense of the Revolution (CDR's). The Government traditionally uses the

CDR's to mobilize citizens against "dissenters," impose ideological conformity, and root out "counterrevolutionary" behavior.

98.     The lack of human rights in Cuba is universally known and amply chronicled. The 2010 edition of the Country Reports on Human Rights Practices, which was submitted to the Congress by the U.S. Department of State, describes the Cuban governments disregard for their own Constitutionally mandated rules of procedure in the course of criminal detention. As much as 64 percent of pretrial detainees have spent weeks and sometimes months without having ever seen an attorney or being informed of the charges against them. Bail is rarely granted and detainees have been held for months or years in investigative detention, where detainees can be interrogated at any time and have no right to request the presence of counsel.

99.     Judicial Tribunals also disregard the constitutionally mandated treatment of accused persons by placing the burden on the defendant to prove innocence rather than on the prosecution to prove guilt, and in fact, Tribunals frequently find accused individuals guilty of "potential dangerousness", which requires the commitment of no crime at all, but instead is determined to be a special proclivity to commit crimes, which is demonstrated by the accused's conduct in manifest contradiction of socialist norms.

100.     The report illustrates the detainment facilities deplorable state as follows:

Prison conditions continued to be harsh and life threatening. Food shortages were widespread, available food was often spoiled or infested with vermin, and many prisoners relied on family parcels of up to 30 pounds of food and other basic supplies that were brought during each visit. Prison cells lacked adequate water, sanitation, space, light, ventilation, and temperature control. Running water was rare and, if available, generally ran only for a limited time. Water for drinking and bathing was foul and frequently contaminated with parasites. Many prisoners reported receiving only one small glass of water per day, even when confined to sweltering cells during the summer. Vermin and insect infestations were common, with inmates reporting rats, cockroaches, fleas, lice, bedbugs, stinging ants, flies, and mosquitoes. Prisoners reported that they lacked access to basic and emergency medical care, including dental care.

Prison cells were overcrowded, requiring prisoners to sleep on the floor and limiting freedom of movement during the day. Prisoners, family members, and nongovernmental organizations (NGOs) reported inadequate health care, which led to or aggravated hypertension, diabetes, heart conditions, asthma, skin disease, infections, digestive disorders, and conjunctivitis, among other maladies. The Cuban Commission for Human Rights and National Reconciliation

(CCDHRN) reported multiple prison deaths from heart attacks, asthma attacks, and other chronic medical conditions, as well as from suicide.

<u>HUMAN TRAFFICKING IN CUBA</u>

101.    Every year the United States' Department of State produces an annual Trafficking In Persons Report. Every year since 2003, the United States in its report publicly accuses Cuba of condoning, perpetuating, and profiting from the Trafficking of Persons. The 2008 report contained the fifth such accusation, but not the last, as Cuba is still considered to be a hub of human trafficking.

102.    Cuba strongly condemned and continues to condemn the accusations contained in the reports, and launched a verbal attack against the United States, accusing the United States of promoting smuggling of Cuban citizens.

103.    Cuba began a campaign of accusing and condemning American citizens and residents, mostly Cuban-Americans, of committing an offense under Cuban Penal Code 347(2), Trafficking in Persons, which states  in relevant part that "any person, who is not so authorized and with the purpose of making money, organizes or ***promotes*** the exiting of the national territories of persons who are in the country for a destination to third parties" is guilty of Trafficking in person and shall be liable to sentences of between seven (7) to fifteen (15) years. [emphasis added]

104.    The statute is so vaguely written as to apply to almost any interpretation, as the word "promote" within the law has been loosely applied to meet almost any conversation in which an accused may engage, and the law itself has been applied as a panacea to any and all cases that lack any physical and sometimes even testimonial evidence, including the case of a Cuban-American man, Yamil Dominguez, who was accused and condemned to ten (10) years in a Cuban prison under this statute for allegedly seeking to smuggle his girlfriend out of Cuba, something which clearly does not fit the plain meaning of the statute as there would be no fiscal remuneration involved in attempting to smuggle out his own girlfriend.

## PRISON CONDITIONS IN CUBA

105.    The subhuman conditions endured by CURBELO GARCIA are not unique to his prison, although the worst punishments are generally reserved for dissidents or Cuban-Americans.

106.    The conditions described above are well known by the Cuban community at large, as evidenced by news articles published about it inside Cuba, and through well-publicized testimony from prisoners' families, who are left to provide all of the prisoners' necessities any way they can.

## DEFENDANT'S CONSPIRACY WITH AND
## AIDING AND ABETTING OF THE CUBAN GOVERNMENT

107.    Heretofore and at the time of the occurrences herein, Defendants had entered into a conspiracy and a joint plan with the Cuban government to effectuate a variety of purposes that were of mutual benefit to DEFENDANTS and the Cuban Government.

108.    As indicated above, CHAPMAN, a Cuban baseball star, who was never punished after he had been apprehended by authorities trying to flee the country in March 2008, met with Raul Castro subsequent to the attempt, and had a private meeting with him.

109.    CHAPMAN walked away from that meeting miraculously unscathed and, as he later stated in various interviews, with a new found determination to escape the island, to keep his escape plans secret, and to prove his loyalty to his country to draw off suspicion from himself.

110.    In that meeting, CHAPMAN entered into an agreement Castro to prove his loyalty to the government by becoming an agent of the government, thereby drawing suspicion from himself.

111.    The benefit received by the Cuban government was CHAPMAN's role in helping to make examples of real or perceived dissidents and traitors inside and outside of Cuba, in violation of rules of procedure, rules of evidence, and customary international law. CHAPMAN's role was fulfilled in the successful prosecution of CURBELO

GARCIA and several others, who are currently serving time in Cuban prisons for allegedly trying to smuggle him out of the country.

112.    CHAPMAN benefited from the conspiracy by drawing suspicion away from himself, which permitted him to again be allowed on the Cuban National team and escape in a foreign land.

113.    BENETT benefited from the conspiracy by helping to occasion his son's escape, which materially benefits him and his family in Cuba.

114.    Pursuant to the conspiracy, CHAPMAN accused several individuals, one a man known as "Lisandro", of offering to smuggle him out of the country, and those individuals are currently serving prison sentences in Cuba.

115.    Pursuant to the conspiracy, CHAPMAN called the DCSE on or about July 30, 2008 to provide false information about CURBELO GARCIA.

116.    In furtherance of that conspiracy, CHAPMAN and BENETT made false and conflicting declarations to the DCSE investigators, and provided further conflicting testimony at CURBELO GARCIA's sham trial.

117.    At all times CHAPMAN and BENETT knew the CURBELO GARCIA was a resident of the United States and lived in Florida with his family.

118.    At all times CHAPMAN and BENETT knew that CURBELO GARCIA would not be afforded the rights of a foreigner, but, as an exile, living in Miami, would be treated as a dissident.

119.    At all times CHAPMAN and BENETT knew that the sentence for smuggling citizens out of Cuba was a deprivation of liberty in Cuban prison for a period of between seven (7) years to 15 (15) years.

120.    At all times CHAPMAN and BENETT knew of Cuba's disregard for the rules of procedure or prisoner's rights, and that that country's judicial system often leaves prisoners for many months without charges or trial, and that when any trial is granted, those trial rarely adopt any semblance of fairness.

121.    At all times CHAPMAN and BENETT were aware of the continued "investigation" of the case and that CURBELO GARCIA remained in detention throughout the many months, and that he had not been released from detention before the sham trial, which took place six (6) months after his detention.

122.    At all times CHAPMAN and BENETT knew of Cuba's notorious prison conditions, with treatment that is no different than torture and often result in the crippling or death of the inmates.

123.    CHAPMAN and BENNET conspired with the Cuban government to secure CURBELO GARCIA's arbitrary and prolonged detention and torture, acting as catalysts for his arbitrary arrest and impetus for his continued detention and torture in contravention of the laws of nations.

124.    CHAPMAN and BENETT were the catalysts for and aided and abetted the Cuban government in its arbitrary and prolonged detention and its torture of CURBELO GARCIA, becoming the sole source for the government's illegal actions in contravention of the laws of nations.

125.    CHAPMAN and BENETT at all times entered into the conspiracy with the intent or purpose of facilitating the Cuban government to commit arbitrary arrest, prolonged detention, and torture in contravention to the laws of nations, and the Cuban government did, in fact, commit those violations in the case of CURBELO GARCIA and several other individuals currently residing in Cuban prisons.

126.    CHAPMAN and BENETT at all times aided and abetted the Cuban government to commit arbitrary arrest, prolonged detention and torture of CURBELO GARCIA and others in contravention to the laws of nations. The Defendants' assistance was indispensable to the Cuban government's commission of the international law violations and were provided to the government willingly and for the purpose of advancing that government's illegal goals.

<u>COUNT I</u>
**ARBITRARY AND PROLONGED DETENTION IN VIOLATION OF ATCA**
**(Against both Defendants)**

Plaintiffs repeat and re-allege all of the previous allegations set forth in Paragraphs 1-126 of this complaint with the same force and effect as if fully set forth again.

127.    At all times relevant hereto CURBELO GARCIA was a citizen of Cuba.

128.    CURBELO GARCIA was arbitrarily arrested and was subjected to prolonged detention in violation to the established norms of international law.

129.    During CURBELO GARCIA's detention, he was interrogated at frequent and sporadic intervals without being provided with an opportunity to have an attorney present, was held in detention for six (6) months without the benefit of appearing before a judge, a tribunal, or a hearing officer, being offered a chance to provide bail or being informed of the charges against him in contravention of international law.

130.    At trial, the tribunal ignored the lack of physical evidence against CURBELO GARCIA, ignored the testimony in Plaintiff's favor provided by MEDINA and PARRA, the lead police investigator, ignored the legal standard demanded by the statute, and decided against CURBELO GARCIA based solely on the false testimony of the Defendants.

131.    Defendants (a) knowingly and substantially assisted the Cuban government in the arbitrary arrest and prolonged detention in violation of clearly established international law norms, and they (b) facilitated the commission of international law violations by providing the violators with false accusations against CURBELO GARCIA, occasioning his arrest and his prolonged detention for the six month period leading up to the sham trial and securing CURBELO GARCIA's continued detention and torture by falsely testifying against him in court.

132.    Defendants acted with the intent to assist in the violation of international law.

133.    Defendants were aware that their acts and omissions assisted in the violation of international law

134.    Plaintiffs have no alternative remedy to redress their injuries other than to file this action. Legal action by Plaintiffs in Cuba would be futile, as that country has already demonstrated that CURBELO GARCIA has no rights at all there—his appeal was denied, and

the Plaintiff and his family's claims that Defendants had lied have been ignored. In addition, CHAPMAN has left that country for the United States and Cuba has no jurisdiction over him.

135.    Further, Legal action by Plaintiffs in Cuba could also result in serious reprisals. CURBELO GARCIA has already experienced such vengeance from the prison guards when his family complained about his treatment there.

136.    That by reason of the arbitrary and prolonged detention of CURBELO GARCIA has been deprived of his freedom without the benefit of legal procedure, has suffered both physical and mental conscious pain and suffering, and all Plaintiffs have suffered pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

## COUNT II
## TORTURE IN VIOLATION OF TVPA
### (Against both Defendants)

Plaintiffs repeat and re-allege all of the previous allegations set forth in Paragraphs 1-136 of this complaint with the same force and effect as if fully set forth again.

137.    The treatment of CURBELO GARCIA in prison was torture in violation of the TVPA.

138.    The deliberate and frequent acts of torture administered on CURBELO GARCIA were conducted under color of law. Although CURBELO GARCIA was not afforded all the judicial guarantees which are recognized as indispensable by civilized peoples, the acts of torture were authorized by a Cuban tribunal, and were conducted by government officials, prison guards, and DCSE investigators.

139.    Defendants knowingly and substantially assisted the government actors to commit acts that violate clearly established international law norms, and (b) facilitated the commission of international law violations by providing the violators with false accusations against CURBELO GARCIA, occasioning his arrest, prolonged detention, and torture for the six month period leading up to the sham trial and securing CURBELO GARCIA's continued detention and torture by falsely testifying against him in court.

140.    Defendants acted with the intent to assist in the violations of international law.

141.    Defendants were aware that their acts and omissions assisted in the violations of international law

142.    Plaintiffs have no alternative remedy to redress their injuries other than to file this action. Legal action by Plaintiffs in Cuba would be futile, as that country as already demonstrated that CURBELO GARCIA has no rights at all in that country and it has ignored CURBELO GARCIA's claims that Defendants had lied. In addition, CHAPMAN has left that country for the United States and Cuba has not jurisdiction over him.

143.    Further, Legal action by Plaintiffs in Cuba could also result in serious reprisals. Individuals who seek redress for the tortuous prison conditions and actions committed against them in prison are subjected to further violence or aggravated conditions in retribution, and CURBELO GARCIA has already experienced such vengeance from the prison guards when his family complained about his treatment there. This system has been well-documented in credible human rights reports by the U.S. Department of State, Human Rights Watch and Amnesty International.

144.    By reason of the torture conducted upon CURBELO GARCIA has suffered both physical and mental conscious pain and suffering and all Plaintiffs have suffered pecuniary and economic damages, loss of support, loss of nurture care and guidance, grief, anguish, loss of society, loss of services and other injuries, and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

## COUNT III
## LOSS OF CONSORTIUM UNDER THE LAW OF FLORIDA
### (Against both Defendants)

Plaintiffs repeat and re-allege all of the previous allegations set forth in Paragraphs 1-144 of this complaint with the same force and effect as if fully set forth again.

145.    At all times relevant hereto, TURRUELLAS was and is lawfully married to CURBELO GARCIA.

146.    CURBELO GARCIA provided the bulk of the economic support for his family by the operation of his farm in Hialeah, Florida.

147.     CURBELO GARCIA also organized the family's documentary affairs, including all financial accounts, taxes, properties, and, importantly, the mortgage.

148.     Since his arbitrary arrest and prolonged detention in Cuba, the family has lost the farm and the income that came from that business, TURRUELLAS has been unable to transfer title of the family car, which was under his name, to her own name and she is losing the family home because the mortgage is solely under his name and she is therefore unable to refinance the loan, a solution that would be available to her under other circumstance.

149.     CURBELO GARCIA's arbitrary arrest and prolonged and continued detention in Cuba was caused by Defendants' deliberate actions, conducted with reckless disregard for Plaintiff's well-being, and in furtherance of their conspiracy with the Cuban government to violate international law.

150.     As a result of Defendants' deliberate, malicious, and reckless actions, TURRUELLAS has suffered loss of consortium, loss of services, loss of society, mental anguish, and loss of capacity for enjoyment of life and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

<u>**COUNT III**</u>
**LOSS OF PARENTAL CONSORTIUM UNDER THE LAW OF FLORIDA**
**(Against both Defendants)**

Plaintiffs repeat and re-allege all of the previous allegations set forth in Paragraphs 1-150 of this complaint with the same force and effect as if fully set forth again.

151.     At all times relevant hereto, CURBELO was and is the natural child of CURBELO GARCIA and TURRUELLAS.

152.     At all times relevant hereto, CURBELO was and is unmarried and dependent on her parents.

153.     At the time of CURBELO GARCIA's arrest, she was sixteen (16) years of age and attending of high school.

154.     CURBELO GARCIA provided the bulk of the economic support for his family by the operation of his farm in Hialeah, Florida.

155.    CURBELO GARCIA also organized the family's documentary affairs, including all financial accounts, taxes, properties, and, importantly, the mortgage.

156.    Since his arbitrary arrest and prolonged detention in Cuba, the family has lost the farm and the income that came from that business, CURBELO was forced to find a job at a pizza parlor in order to help her mother pay the bills, was forced to take a loan to attend school part-time rather than full-time as was the family's plan,  and she and her mother are losing the family home because the mortgage is solely under CURBELO GARCIA's name and the family is therefore unable to refinance the loan, a solution that would otherwise be available to them.

157.    CURBELO GARCIA's arbitrary arrest and prolonged and continued detention in Cuba was caused by Defendants' deliberate actions, conducted with reckless disregard for Plaintiff's well-being, and in furtherance of their conspiracy with the Cuban government to violate international law.

158.    As a result of Defendants' deliberate, malicious, and reckless actions, CURBELO has suffered loss of consortium, loss of services, loss of society, mental anguish, and loss of capacity for enjoyment of life and accordingly, the plaintiffs claim all damages allowed by law, including compensatory and punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, on each and all causes of action in this Complaint on behalf of each and all Plaintiffs against each and all Defendants, jointly and severally, for compensatory damages in the sum of $3 million for each individual plaintiff, totaling $9 million (NINE MILLION DOLLARS) in compensatory damages, and punitive damages in the sum of $3 million for each individual plaintiff, totaling $9 million (NINE MILLION DOLLARS) in punitive damages, making in all the sum of $18,000,000.00 (EIGHTEEN MILLION DOLLARS), along with interest, costs and disbursements.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all causes of action.


By: _s/Avelino J. Gonzalez_____
Avelino J. Gonzalez, Esq., FBN 75530
Kenia Bravo, Esq., FBN 68296
Law Offices of Avelino J. Gonzalez, P.A.
6780 Coral Way, Miami, Florida 33155
Ph: 305-668-3535; Fax: 305-668-3545
E-mail: AvelinoGonzalez@bellsouth.net