**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 12-21891-CIV-ALTONAGA/Simonton**

**DANILO CURBELO GARCIA**, *et al.*,

      Plaintiffs,

vs.

**AROLDIS CHAPMAN**, *et al.*,

      Defendants.

_____/

**OMNIBUS ORDER**

**THIS CAUSE** came before the Court on three motions filed by Defendant Aroldis Chapman ("Defendant" or "Chapman") on September 4, 2012: a Motion to Dismiss . . . ("Motion to Dismiss") [ECF No. 55];[1] a Motion to Strike Portions of Plaintiffs' First Amended Complaint ("Motion to Strike") [ECF No. 56];[2] and a Motion to Drop Carlos Rafael Mena Perdomo as a Party ("Motion to Drop") [ECF No. 57].[3] On October 31, 2012 the Court held a hearing ("October 31 Hearing") to address the three motions. (*See* [ECF No. 80]). The Court has carefully considered the parties' written submissions, oral arguments, and applicable law.

**I. Background**[4]

In their First Amended Complaint ("Amended Complaint") [ECF No. 46], Plaintiffs

---

[1]  Plaintiffs filed a Response to Defendant's Motion to Dismiss . . . ("MTD Response") [ECF No. 65] on October 1, 2012, to which Chapman replied ("MTD Reply") [ECF No. 73] on October 17, 2012.

[2]  Plaintiffs filed a Response in Opposition to Defendant's Motion to Strike ("Strike Response") [ECF No. 66] on October 1, 2012, to which Chapman replied ("Strike Reply") [ECF No. 74] on October 17, 2012.

[3]  Plaintiffs filed a Response in Opposition to Defendant's Motion to Drop . . . ("Drop Response") [ECF No. 67] on October 1, 2012, to which Chapman replied ("Drop Reply") [ECF No. 75] on October 17, 2012.

[4]  The facts are taken from the Amended Complaint and are accepted as true.

Danilo Curbelo Garcia ("Curbelo Garcia"), Maylen Turruellas ("Turruellas"), Yunis Curbelo ("Curbelo"), and Carlos Rafael Mena Perdomo ("Perdomo") (collectively "Plaintiffs"), allege officials of the Cuban government subjected Curbelo Garcia and Perdomo to prolonged arbitrary detentions and torture after Chapman and his father, Co-Defendant Juan Alberto Chapman Benett ("Benett"), falsely accused Curbelo Garcia and Perdomo of offering to help Chapman escape Cuba. (*See generally* Am. Compl.). The Amended Complaint includes six counts.[5] In Counts I and V, Curbelo Garcia and Perdomo, respectively, allege Chapman violated the Alien Tort Statute ("ATS").[6] (*See id.* ¶¶ 326–35, 358–66). In Counts II and VI, Curbelo Garcia and Perdomo, respectively, allege Chapman violated the Torture Victim Protection Act ("TVPA").[7] (*See id.* ¶¶ 336–43, 367–73). In Counts III and IV, Turruellas and Curbelo, respectively, present state claims for loss of consortium. (*See id.* ¶¶ 344–57). The Amended Complaint additionally includes scores of allegations and exhibits regarding the Cuban justice system and detailing the human rights abuses commonly committed by the Cuban government. The Court now turns to the factual allegations underlying Plaintiffs' claims.

Chapman is a Cuban citizen and an "internationally acclaimed baseball player." (*Id.* ¶ 13). In March 2008, Chapman attempted to flee Cuba, but his attempt was thwarted when Cuban authorities uncovered his plan and stopped him. (*See id.* ¶ 221). The usual punishment for athletes who attempt to flee Cuba is at least a two-year suspension from their sport's Cuban National Team and National Series, and some athletes are banned for life. (*See id.* ¶ 219).

---

[5] Each of the six counts is alleged against Chapman and Benett; however, Benett has not yet been served.

[6] Under the ATS, "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

[7] The TVPA provides, in part: "An individual who, under actual or apparent authority, or color of law, of any foreign nation– (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual." Torture Victim Protection Act § 3(a), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (Historical and Statutory Notes)).

Nevertheless, shortly after being caught attempting to flee Cuba, Chapman "was not prosecuted or imprisoned," but was instead "taken to meet with President Raul Castro." (*Id.* ¶ 221). During his meeting with Castro, Chapman "became an informant for the state" (*id.*), and entered into a conspiracy with the Cuban government whereby Chapman falsely accused individuals who the Cuban authorities then arbitrarily detained and tortured (*see id.* ¶¶ 301–10). Two such individuals who Chapman falsely accused are Curbelo Garcia and Perdomo. (*See id.* ¶¶ 109, 123–24). The facts concerning Curbelo Garcia and Perdomo's encounters with Chapman and the Cuban government are as follows.

Curbelo Garcia, an expatriated Cuban citizen, traveled to Cuba to visit his family in July 2008. (*See id.* ¶¶ 31–32). While in Cuba, Curbelo Garcia's friend offered to introduce him to Chapman, and Curbelo Garcia readily agreed. (*See id.* ¶ 33). On July 29, 2012, Curbelo Garcia and his friend crossed paths with Chapman, and the men stopped to talk. (*See id.* ¶¶ 38–39). After speaking for a few minutes, Curbelo Garcia "asked the famous baseball player when he would be leaving the country, to which, Chapman responded that he had learned his lesson from his earlier attempt to leave and that he never intended to leave Cuba." (*Id.* ¶ 40). Curbelo Garcia then expressed that, "in the United States major league baseball players, who were not as good as Chapman, were making millions of dollars," and the conversation ended. (*Id.*).

That night, Chapman called his contact in the Cuban government and reported that Curbelo Garcia and Curbelo Garcia's friend had offered to smuggle Chapman out of Cuba to play baseball in the United States. (*See id.* ¶ 123). The following day, July 30, 2012, Chapman and Benett went to the police station and provided written accusations. (*See id.* ¶ 124). Cuban authorities arrested Curbelo Garcia the same day. (*See id.* ¶ 43). Over the following months, Curbelo Garcia was imprisoned without charges and interrogated. (*See id.* ¶¶ 45–48). During

his detention, Curbelo Garcia suffered many hardships, including random beatings, unsanitary conditions, spoiled food, and arbitrary prison transfers.  (*See id.* ¶¶ 74–76).

Almost six months after his arrest, Curbelo Garcia was put on trial for human trafficking.  (*See id.* ¶¶ 51, 54).  During the trial, Chapman and Benett were the Cuban government's only witnesses, and their testimony contradicted their earlier sworn statements as well as each other's testimony.  (*See id.* ¶¶ 56, 67).  Despite the government's dearth of evidence, Chapman's conflicting testimony, Curbelo Garcia's own testimony, and other witnesses' testimony in Curbelo Garcia's favor, the tribunal convicted Curbelo Garcia of human trafficking and he was sentenced to ten years in prison.  (*See id.* ¶¶ 55–70).  Curbelo Garcia's appeal was denied on December 9, 2009, and no further appeal or other legal recourse is available to Curbelo Garcia inside Cuba.  (*See id.* ¶¶ 72–73).

Perdomo is a citizen of the Dominican Republic.  (*See id.* ¶ 82).  On July 7, 2008, Perdomo traveled to Cuba to visit his former in-laws and conduct business.  (*See id.* ¶ 85).  On July 15, 2012, Chapman filed a victim's denunciation against Perdomo and Perdomo's former brother-in-law, stating the two had offered to smuggle Chapman out of Cuba to play baseball in the Dominican Republic.  (*See id.* ¶ 109).  The following day, Perdomo was arrested, questioned, and detained for months without proper medical attention.  (*See id.* ¶¶ 87–98).  Perdomo's "deprivations were not as sever [sic] as that [sic] of Curbelo Garcia, but they were sever [sic] enough to be categorized as torture."  (*Id.* ¶ 117).

It was not until March or April 2009 that Perdomo learned he was being detained as a result of Chapman's accusations.  (*See id.* ¶¶ 102–104).  Perdomo was surprised by the accusations because he had never "met, seen, or spoken to Chapman."  (*Id.* ¶ 104).  Then, on June 3, 2009, Perdomo was tried for human trafficking.  (*See id.* ¶¶ 107–8).  Chapman testified

— despite admitting to never having seen, met or talked to Perdomo — that Perdomo's former brother-in-law was working as Perdomo's intermediary and the two had offered to smuggle Chapman out of the country. (*See id.* ¶¶ 110–11). Perdomo was convicted based on Chapman's false accusations and was sentenced to nine years in prison, but was released in April 2012 for humanitarian reasons. (*See id.* ¶¶ 116, 120). Because Perdomo is diabetic and did not receive proper medical attention, he is now "a cripple with multiple organ failure [sic], who has had to slowly amputate parts of his body in an attempt to save his life." (*Id.* ¶ 121).

Plaintiffs allege Chapman is liable for Curbelo Garcia and Perdomo's prolonged arbitrary detentions and torture, not because Chapman was personally involved in detaining or torturing Plaintiffs, but because he provided the Cuban government with the false accusations in the first instance. This furnishing of false accusations, Plaintiffs allege, was part of a conspiracy between Chapman and the Cuban government that Chapman entered into on the day he met Raul Castro. (*See id.* ¶¶ 301–10). When Chapman agreed to the conspiracy, he became part of a pervasive "snitch network of athletes." (*Id.* ¶ 216). This network included "athletes in every team in Cuba," and was so widespread that "[t]here was a special unit of security officials that were in charge of connecting directly with the athletes to seek out reliable informants." (Aff. of Gregorio Miguel Calleiro ("Calleiro Aff.") ¶¶ 8–9 [ECF No. 48-5]). Athletes who voluntarily became government informants reported "suspicious" behavior to their individual handlers in the Department of State Security ("DCSE"). (*Id.* ¶¶ 10–12; *see* Am. Compl. ¶ 216). In return for providing "actionable information for the state," the informants received benefits from the Cuban government, such as the ability to travel with a national team. (Calleiro Aff. ¶ 14). Chapman sought the opportunity to travel with the National Baseball Team as a means of defecting. (*See* Am. Compl. ¶¶ 218, 221).

Moreover, Chapman knew that prisoners in Cuba are regularly subjected to prolonged arbitrary detentions and torture. (*See id.* ¶¶ 314, 317). With this knowledge, Chapman conspired with and aided and abetted the Cuban government to secure the arbitrary and prolonged detentions and torture of Curbelo Garcia and Perdomo, and did so with the "intent or purpose of facilitating" (*id.* ¶¶ 322, 323), and "advancing [the Cuban] government's illegal goals" (*id.* ¶¶ 324, 325). Due to Chapman's "willing[]" and "indispensable" assistance, the Cuban government subjected Cubelo Garcia and Perdomo to prolonged arbitrary detentions and torture. (*Id.*). As a result of the conspiracy, Chapman accomplished the "miraculous feat" of being banned from baseball for a mere five months. (*Id.* ¶ 220). Shortly after his reinstatement on the national team, Chapman successfully defected and currently lives and plays baseball in the United States. (*See id.* ¶ 13).

Chapman now moves the Court to dismiss Plaintiffs' ATS and TVPA claims for lack of subject matter jurisdiction and failure to state a claim (*see* Mot. Dismiss 9), and further seeks dismissal of the loss of consortium claims as they are derivative of the ATS and TVPA claims (*see id.* 35). The Motion to Dismiss is addressed in Section II below. Should the Court deny the Motion to Dismiss, Chapman moves the Court to strike portions of the Amended Complaint (*see generally* Mot. Strike). The Motion to Strike is addressed in Section III below. Lastly, Chapman asks that the Court drop Carlos Rafael Mena Perdomo as a plaintiff (*see generally* Mot. Drop), and this Motion is addressed in Section IV below.

## II. Motion to Dismiss

### A.  Legal Standards

It is well established that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555).  Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.  Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).  To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss."  *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009) (citing *Iqbal*, 129 S. Ct. at 1949), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702 (2012).  When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true.  *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

Attacks on subject matter jurisdiction in a motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure may be either facial or factual.  *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990).  Factual attacks "challenge[] the existence of subject matter jurisdiction in fact . . . and matters outside of the pleadings, such as testimony and affidavits, are considered."  *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).  A facial attack differs from a factual attack because, like a Rule 12(b)(6) motion, it "requires the court merely to look and see if plaintiff has sufficiently alleged a basis of subject matter

jurisdiction, and the allegations in the complaint are taken as true." *Id.* As a practical matter, the difference between a Rule 12(b)(6) motion and a Rule 12(b)(1) motion "is often difficult to discern," albeit the two motions are "analytically different." Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1350 (3d ed. 2007).[8]

### B. Analysis

Chapman moves to dismiss the Amended Complaint on several grounds. First, Chapman argues Plaintiffs' ATS claims must be dismissed because the Court lacks subject matter jurisdiction and the Amended Complaint fails to state a claim upon which relief may be granted pursuant to the ATS. (*See* Mot. Dismiss 9–17; MTD Reply 2–10). Second, Chapman argues Plaintiffs' TVPA claims must be dismissed because the Amended Complaint fails to state a claim upon which relief may be granted pursuant to the TVPA. (*See* Mot. Dismiss 17–20). Third, Chapman argues the Court should decline jurisdiction due to several practical considerations. (*See id.* 20–35; MTD Reply 11–12). Fourth, and finally, Chapman argues Plaintiffs' state law claims should be dismissed because they are derivative in nature and fail due to the insufficiency of Plaintiffs' federal claims. (*See* Mot. Dismiss 35–36). The Court addresses each of these arguments *seriatim*.

### 1. Alien Tort Statute

Under the ATS, "district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. While the statute is jurisdictional and does not create an independent cause of action, it is understood that "the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability." *Baloco ex rel.*

---

[8] Chapman's Motion to Dismiss presents a facial attack to the Court's jurisdiction over Plaintiffs' ATS claims.

*Tapia v. Drummond Co., Inc.* 640 F.3d 1338, 1344 (11th Cir. 2011) (internal quotation marks and citation omitted). Federal subject matter jurisdiction exists under the ATS when three elements are satisfied: "(1) an alien (2) sues for a tort (3) committed in violation of the law of nations." *Sinaltrainal*, 578 F.3d at 1261 (citing *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1246 (11th Cir. 2005)).  With regard to the third element of an ATS claim, the Eleventh Circuit recently addressed the contours of the "law of nations" in a discussion of that phrase as used in the Offences Clause, U.S. Const., Art. I, § 8, cl. 10, in *United States v. Bellaizac-Hurtado*, Nos. 11-14049, 11-14227, 11-14310, 11-14311, 2012 WL 5395281, at *5 (11th Cir. Nov. 6, 2012) ("[T]he Alien Tort Statute was enacted by the First Congress and uses the same term of art—'the law of nations'—that is used in the Offences Clause.").  The eighteenth century phrase, "law of nations," means customary international law.  *Id.* (citations omitted).

"[C]ustomary international law is determined by examining state practice and *opinio juris*."  *Id.*  The two components of customary international law are the "general and consistent practice of states," and "a sense of legal obligation, or *opinio juris sive necessitates*."  *Id.* at *6 (quoting *Buell v. Mitchell*, 274 F.3d 337, 372 (6th Cir. 2001)).  Private criminal activity is rarely a violation of customary international law because it is unlikely to be of mutual legal concern.  *Id.* ("[F]or example, murder of one private party by another . . . is not actionable . . . as a violation of customary international law because the nations of the world have not demonstrated that this wrong is of mutual, and not merely several, concern.") (quoting *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 249 (2d Cir. 2003)).  Furthermore, courts "must exercise restraint in defining violations of customary international law because customary international law is, by its nature, difficult to determine."  *Id.*

When Congress first passed the ATS in 1789, there were two principal elements of the law of nations, or customary international law. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004). The first covered the general norms that governed the behavior of national states with each other, occupying the executive and legislative domains. *See id.* The second "more pedestrian" element fell within the judicial sphere and consisted of judge-made law regulating the conduct of individuals situated outside domestic boundaries. *Id.* at 715. And finally, there was a sphere in which the rules binding individuals for the benefit of other individuals overlapped with the norms of state relationships. *See id.* These were captured by three offenses against the law of nations found in the criminal law of England: "violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.* (citation omitted).

Under *Sosa*, new causes of action may be recognized under the ATS only if they "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the Supreme Court has] recognized." *Id.* at 725; *see also Sinaltrainal*, 578 F.3d at 1262 ("[T]he judicial power to recognize new law of nations violations 'should be exercised on the understanding that the door is still ajar subject to *vigilant doorkeeping*.'") (emphasis in original) (quoting *Sosa*, 542 U.S. at 729). Courts must exercise great caution in considering new causes of action, as only a "narrow class of international norms" may support an ATS claim. *Sosa*, 542 U.S. at 729. Additionally, courts must consider the practical consequences of creating new claims, including whether such a new claim would "imping[e] on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Id.* at 727. As a result, courts have recognized only a "modest number of additional causes of action" under the ATS. *In re Chiquita Brands Int'l, Inc. Alien Tort Statute and S'holder Derivative Litig.*, 792 F. Supp. 2d 1301, 1312 (S.D. Fla. 2011).

"State-sponsored torture, unlike torture by private actors, likely violates international law and is therefore actionable under the [ATS]. . . . A claim for state-sponsored torture under the [ATS] . . . may be based on indirect liability as well as direct liability." *Aldana*, 416 F.3d at 1247–48 (internal citations omitted). Furthermore, the ATS "reaches conspiracies and accomplice liability." *Id.* at 1248 (internal quotation marks omitted) (citing *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157 (11th Cir. 2005)). Thus, under the law of the Eleventh Circuit, a plaintiff may assert secondary liability against individuals who conspired with or aided and abetted the perpetrators of the violations of the law of nations even when such individuals did not personally commit violations of the law of nations. *See In re Chiquita*, 792 F. Supp. 2d at 1340, 1341 ("Under the law of this Circuit, aiding and abetting liability survives the limitations that *Sosa* placed upon ATS claims. . . . [U]nder the law of this Circuit, conspiracy is a recognized theory of secondary liability under the ATS.").

Chapman argues the Court should dismiss Plaintiffs' ATS claims, stated in Counts I and V, because (1) Plaintiffs' claims are not cognizable under the ATS as Plaintiffs fail to plead a violation of the law of nations; (2) Plaintiffs fail to allege the requisite state action; and (3) Plaintiffs fail to plead secondary liability. While Chapman does not specify whether his various arguments should be addressed under a Rule 12(b)(6) or a Rule 12(b)(1) analysis, the Court comments on the issue briefly. The district court in the *Sinaltrainal* litigation noted that this Circuit's precedent "does not specify the extent to which the 12(b)(1) analysis in the context of an [ATS] claim overlaps with that of a 12(b)(6) analysis." *In re Sinaltrainal Litig.*, 474 F. Supp. 2d 1273, 1284 (S.D. Fla. 2006), *aff'd in part, vacated in part, remanded sub nom. Sinaltrainal*, 578 F.3d 1252. On appeal, the Eleventh Circuit stated it was reviewing a "motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)," *Sinaltrainal*, 578 F.3d at 1260, and

then analyzed the pleadings under a Rule 12(b)(6) standard, frequently citing *Iqbal* and *Twombly* in its discussion of whether the court had jurisdiction over the plaintiffs' ATS claims, *see id.* at 1266–69. The Eleventh Circuit further "reiterate[d] that to state a plausible claim for relief [under the ATS], the plaintiffs must plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,'" *id.* at 1268 (quoting *Iqbal*, 129 S. Ct. at 1949), and held that because the plaintiffs "fail[ed] to state a plausible claim for relief . . . the district court did not err in dismissing the ATS claims . . . for lack of subject matter jurisdiction" *id.* at 1269. The Court employs the Eleventh Circuit's mode of analysis. If Plaintiffs fail to state a plausible claim under the ATS, the effect of that ruling is the Court lacks jurisdiction over the ATS claims. *See Abecassis v. Wyatt*, 704 F. Supp. 2d 623, 651 (S.D. Tex. 2010) ("[I]f this court finds that the alien plaintiffs fail to state a claim on one of their ATS causes of action, the effect of that ruling is that this court lacks jurisdiction over that cause of action").[9] The Court now turns to each of Chapman's arguments.

### a. Violation of the Law of Nations

Chapman, focusing on his own alleged conduct, argues providing false accusations and false testimony is not a violation of the law of nations. (*See* Mot. Dismiss 12). While Chapman's assertion may be true, it mischaracterizes Plaintiffs' ATS claims. Viewing the Amended Complaint in the light most favorable to Plaintiffs, Plaintiffs seek to hold Chapman liable for his participation in the Cuban government's prolonged arbitrary detentions and torture

---

[9] The Eleventh Circuit has "specifically" not "decide[d] whether a heightened pleading standard may be used in evaluating the elements of an ATS or TVPA claim." *Sinaltrainal*, 578 F.3d at 1265, n.14. Because the Eleventh Circuit has not determined the issue, and Chapman has not argued that a heightened pleading standard should apply, the Court does not apply a heightened standard here.

of Curbelo Garcia and Perdomo.  (*See* Am. Compl. ¶¶ 326–335; 358–366).[10]  Plaintiffs confirm as much in their Response to the Motion to Dismiss.  (*See* MTD Resp. 17 ("Plaintiffs have always pursued a claim for indirect or agency liability against Defendants.")).  Consequently, the Court must determine whether torture and prolonged arbitrary detentions — not providing false accusations or false testimony — are norms "of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms [the Supreme Court has] recognized."  *Sosa*, 542 U.S. at 725.  And indeed, prolonged arbitrary detentions and torture have both been recognized as violations of the law of nations cognizable under the ATS.  *See, e.g.*, *In re Chiquita*, 792 F. Supp. 2d at 1324 ("Torture [is a] recognized violation[] of the law of nations under the ATS.") (citations omitted); *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 17 (D.C. Cir. 2011) ("[Plaintiffs] contend, and Exxon does not dispute, that extrajudicial killing, torture, and prolonged arbitrary detention are clearly established norms of international law."); *see also* Restatement (Third) of Foreign Relations Law § 702(d), (e). Plaintiffs have sufficiently alleged the Cuban government violated the law of nations, and Chapman's arguments to the contrary are better suited to an analysis of whether Plaintiffs have sufficiently alleged secondary liability.

### b.  State Action

Most ATS claims — including Plaintiffs' claims here — are only cognizable when committed by state actors or under color of law.  *See In re Chiquita*, 792 F. Supp. 2d at 1325

---

[10]  Although Plaintiffs' ATS counts are both titled "Arbitrary and Prolonged Detention in Violation of the ATCA," Plaintiffs allege Chapman is liable under the ATS for the Cuban government's torture of Curbelo Garcia and Perdomo in addition to the Cuban government's prolonged arbitrary detentions of Curbelo Garcia and Perdomo.  (*See* Am. Compl. ¶¶ 330, 366).  Furthermore, Chapman appears to agree Plaintiffs' ATS counts allege both prolonged arbitrary detentions and torture.  (*See, e.g.*, Mot. Dismiss 16 (arguing Plaintiffs fail to allege secondary liability against Chapman under the ATS for Curbelo Garcia and Perdomo's "detention and torture.")).

(citations omitted).  The parties disagree whether Plaintiffs must allege Chapman was a state actor or acted under color of law, or if it is sufficient for Plaintiffs to allege the individuals who directly committed the violations of the law of nations were state actors.  Chapman argues Plaintiffs "must sufficiently plead that Chapman acted under the color of Cuban law" in order to fulfill the state action requirement.  (Mot. Dismiss 12).  Plaintiffs maintain they need only allege the individuals who arbitrarily detained and tortured Curbelo Garcia and Perdomo were state actors.  (*See* MTD Resp. 17).[11]

The Eleventh Circuit's decision in *Sinaltrainal* provides guidance on this issue.   In *Sinaltrainal*, certain plaintiffs alleged paramilitaries perpetrated violations of the law of nations, while other plaintiffs alleged the local police committed the violations.  *See Sinaltrainal*, 578 F.3d at 1266, 1267 ("In *Gil, Galvis,* and *Leal,* paramilitary officers are alleged to have perpetrated murder and torture, which form the basis of their ATS claims. . . . In *Garcia,* the complaint alleges a conspiracy between the local police, rather than paramilitary officers, and the [defendant's] management.").  The Eleventh Circuit affirmed the dismissal of the former plaintiffs' ATS claims because they did not adequately allege the paramilitaries were state actors or acted under color of Colombian law.  *See id.* at 1267 ("[T]he plaintiffs have not sufficiently pled state action.  Accordingly, we conclude the district court did not err in dismissing the ATS claims in the *Gil, Galvis,* and *Leal* complaints for lack of federal subject matter jurisdiction.").

Contrarily, the Eleventh Circuit did not discuss the state action requirement with respect to the claims of the second group of plaintiffs that the local police committed the violations of the law of nations, presumably because when local police are alleged to have committed violations of the law of nations, this fulfills the state action requirement.  *See id.* at 1267–69.

---

[11]  Plaintiffs also argue they have adequately alleged Chapman acted under color of law.  (*See* MTD Resp. 13, 24).  The Court does not reach this argument because it bases its decision on other grounds.

Instead, the court focused its analysis on whether the plaintiffs adequately alleged secondary liability. *See id.* To plead state action for ATS purposes under a theory of secondary liability, Plaintiffs must allege the individuals who directly committed the violations of the law of nations — here, representatives of the Cuban government, not Chapman — were state actors or acted under color of law. *See Eastman Kodak v. Kavlin*, 978 F. Supp. 1078, 1091 (S.D. Fla. 1997) (discussing the state action requirement under the ATS in connection with conspiracy allegations and stating the parties' arguments regarding state action were "a little beside the point" because "[u]ndeniably Bolivia *did act* in confining [the plaintiff] for eight or ten days. The question is whether plaintiffs have sufficiently alleged that defendants participated in that action so as to make them liable for the act of the State. Stated otherwise, the question is whether the ATCA makes a private actor liable in tort for conspiring with state actors to violate the law of nations.") (emphasis in original).

Here, Plaintiffs allege representatives of the Cuban government, while acting in their official capacities, committed the prolonged arbitrary detentions and torture. (*See* Am. Compl. ¶¶ 330, 337, 362, 368). Such representatives of the Cuban government are undoubtedly state actors. As a result, Plaintiffs sufficiently allege state action under the ATS. *See Aldana*, 416 F.3d at 1249–50 (finding the active participation of at least one state actor in the violation of international law satisfies the state action requirement); *see also Eastman Kodak*, 978 F. Supp. at 1091 ("[A]lthough the negative prohibitions of our own Constitution generally extend only to state action, those who conspire with state actors to invade the constitutional rights of others may be held liable along with the state actors."). Thus the Court must next determine whether Plaintiffs have sufficiently alleged Chapman is secondary liable for the Cuban government's violations of the law of nations.

### c. Secondary Liability

Plaintiffs allege Chapman is liable for their injuries because Chapman conspired with and aided and abetted the Cuban government in its violations of the law of nations when he falsely accused Curbelo Garcia and Perdomo of offering to help Chapman flee Cuba. (*See* MTD Resp. 17–18). To plead conspiracy liability, Plaintiffs must allege: (1) Chapman and the Cuban government agreed to commit a violation of recognized international law; (2) Chapman joined the agreement with the purpose or intent to facilitate the commission of the violation; and (3) the Cuban government committed the violation. *See In re Chiquita*, 792 F. Supp. 2d at 1344 (citations omitted). To plead aiding and abetting liability, Plaintiffs must allege: (1) the Cuban government committed an international law violation; (2) Chapman acted with the purpose or intent to assist in that violation; and (3) Chapman's assistance substantially contributed to the Cuban government's commission of that violation. *See id.* at 1343–44 (citations omitted). The "purpose or intent" necessary under both aiding and abetting and conspiracy "requires more than mere knowledge of the principal's unlawful goals." *Id.* at 1343. Plaintiffs must allege Chapman acted with the "specific purpose that the [Cuban government] commit the international-law offenses alleged in the [Amended Complaint]." *Id.* at 1344. In other words, Plaintiffs must allege Chapman specifically intended for the Cuban government to subject Curbelo Garcia and Perdomo to prolonged arbitrary detentions and/or torture.

The Court addresses first the sufficiency of the conspiracy allegations. With respect to the first element of conspiracy, Chapman argues Plaintiffs fail to adequately allege an agreement between Chapman and the Cuban government to violate the law of nations. (*See* MTD Reply 8). Chapman asserts Plaintiffs' allegations, like the plaintiffs' allegations in *Sinaltrainal*, are "based on pure speculation." (*Id.* (citing *Sinaltrainal*, 578 F.3d at 1268)). Chapman further asserts

Plaintiffs "offer no factual content that would allow the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (Mot. Dismiss 15 (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)).

In *Sinaltrainal*, the plaintiffs' allegations of an agreement between the defendants' management and the local police rested on vague and conclusory allegations that the "plan" to have the plaintiffs arbitrarily detained and tortured as a result of the management's false accusations "necessarily required the cooperation and complicity of the arresting police officers," and the premise for the conspiracy was "either payment of money or shared ideology." *Id.*, 578 F.3d at 1268. Such an "attenuated chain of conspiracy fail[ed] to nudge [the plaintiffs'] claims across the line from conceivable to plausible." *Id.* (citing *Twombly*, 550 U.S. at 570). Moreover, the plaintiffs failed to allege "when or with whom the [management] entered into a conspiracy to arrest, detain and harm the plaintiffs," failed to define the "scope of the conspiracy and its participants," and did not allege that "the treatment the plaintiffs received at the hands of the local police and in prison was within the scope of the conspiracy." *Id.*

By contrast, Plaintiffs here allege Chapman's involvement in the conspiracy began when he met with Raul Castro. (*See* Am. Compl. ¶¶ 221, 299). During that meeting, Chapman "entered into an agreement with Castro to prove his loyalty to the government by becoming an agent of the government." (*Id.* ¶ 301). Chapman thus "became an informant for the state in order to recuperate his standing as trustworthy." (*Id.* ¶ 221).

Plaintiffs further define the scope of the conspiracy and allege that the Cuban government's prolonged arbitrary detentions and torture of Curbelo Garcia and Perdomo were within the scope of the conspiracy. Specifically, Plaintiffs allege that in becoming an informant, Chapman joined the pervasive "snitch network of athletes" whose members voluntarily report

"suspicious" behavior and "actionable information" to their government handlers in return for benefits.  (*Id.* ¶¶ 216, 218; *see* Calleiro Aff. ¶ 8, 14).  Within the context of this extensive snitch network of athletes and the Cuban government's well-known abuses of prisoners, Chapman "conspired with the Cuban government to secure Curbelo Garcia's [and Perdomo's] arbitrary and prolonged detention[s] and torture, acting as [a] catalyst[] for [Curbelo Garcia and Perdomo's] arbitrary arrest[s] and impetus for [their] continued detention[s] and torture."  (Am. Compl. ¶¶ 318–19 (alterations added); *see also id.* ¶ 314 (Chapman "knew of Cuba's disregard for the rules of procedure or prisoner's rights . . . ."); *id.* ¶ 317 (Chapman "knew of Cuba's notorious prison conditions, with treatment that is no different than torture.")).

As additional evidence of the agreement between the Cuban government and Chapman, Plaintiffs allege Chapman, "pursuant to" and "in furtherance of" the conspiracy, furnished the Cuban government with false accusations and false testimony against Curbelo Garcia and Perdomo.  (*Id.* ¶¶ 307–10).  Such accusations were strikingly similar against both Curbelo Garcia and Perdomo, supporting the conclusion that the accusations were, in fact, false.  And as a result of Chapman's conspiracy with the Cuban government, Chapman was rewarded with a significantly truncated suspension from playing baseball.  (*See id.* ¶¶ 144–46).  Chapman personally benefited from this reduced suspension because it allowed him to "attain his ultimate goal of escaping from Cuba."  (*Id.* ¶ 221).  Given the factual detail concerning the circumstances surrounding Chapman's meeting with Castro, the quick succession of nearly identical false accusations, and the almost immediate concession allowing Chapman back on the national baseball team, the Court finds Plaintiffs' allegations of an agreement between Chapman and the Cuban government to commit violations of the law of nations "nudge [Plaintiffs'] claims across the line from conceivable to plausible."  *Sinaltrainal*, 578 F.3d at 1268 (citing *Twombly*, 550

U.S. at 570).

With respect to the second element of conspiracy, the *mens rea*, Chapman argues the Amended Complaint is devoid of "any factual support" that Chapman's purpose was for Curbelo Garcia and Perdomo to be subjected to prolonged arbitrary detentions and torture and any such conclusions are "contrary to logic and common sense." (Mot. Dismiss 15–16). Chapman insists, "[t]here is no allegation that Chapman entered the alleged conspiracy with the intent to bring about the plaintiffs' detention and torture. Here, according to the Amended Complaint, Chapman's purpose was to be re-instated to the Cuban baseball team." (MTD Reply 7–8).

Contrary to Chapman's characterization of the Amended Complaint, Plaintiffs specifically allege Chapman "entered into the conspiracy with the intent or purpose of facilitating the Cuban government to commit arbitrary arrest, prolonged detention, and torture in contravention to the laws of nations." (Am. Compl. ¶¶ 322–23). Plaintiffs additionally allege sufficient "factual content" — including specific instances of assistance (making false accusations) tied to a specific purpose to assist the Cuban government's violations of international law (prolonged arbitrary detentions and torture) — "that allows the court to draw the reasonable inference" Chapman assisted the Cuban government with the purpose or intent that the Cuban government would subject Curbelo Garcia and Perdomo to prolonged arbitrary detentions and torture. *In re Chiquita*, 792 F. Supp. 2d at 1347 (quoting *Sinaltrainal*, 578 F.3d at 1268). As a result, Plaintiffs' allegations are not so "vague and conclusory" as to be "insufficient to state a claim for relief." *Sinaltrainal*, 578 F.3d at 1268 (citing *Twombly* 550 U.S. at 555). Moreover, while not alleged, the common sense conclusion that Chapman may have had a secondary purpose for falsely accusing Curbelo Garcia and Perdomo — getting back on the baseball team — does not render the well-pleaded allegations superfluous or contradictory.

Instead, such a direct personal benefit to Chapman provides credence to the alleged *quid pro quo* nature of the conspiracy.

With respect to the third element, as discussed, Plaintiffs have described the Cuban government's violations of international law. The Court thus finds it has subject matter jurisdiction over Plaintiffs' ATS claims because Plaintiffs adequately allege Chapman is secondarily liable for conspiring with the Cuban government to violate the law of nations. Given this conclusion, the Court does not address the sufficiency of Plaintiffs' allegations of secondary liability based on an aiding and abetting theory.

### 2. Torture Victim Protection Act

Under the TVPA, "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation– (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual." Torture Victim Protection Act § 3(a), Pub. L. No. 102-256, 106 Stat. 73. A plaintiff may "raise separate claims for state-sponsored torture under the Alien Tort Act and also under the Torture Victim Protection Act." *Aldana*, 416 F.3d at 1251. Here, in addition to their ATS claims, Plaintiffs assert two claims under the TVPA, in Counts II and VI, alleging Chapman is secondarily liable for the Cuban government's state-sponsored torture of Curbelo Garcia and Perdomo. (*See* Am. Compl. ¶¶ 336–43, 367–73). Plaintiffs use "the same sets of facts to assert their claims for ATS and TVPA [violations]" (MTD Resp. 19), which is "not uncommon," *Sintrainal*, 578 F.3d at 1269.

Where, as here, subject matter jurisdiction is conferred by 28 U.S.C. section 1331, "relief from a complaint that fails to sufficiently plead the elements of a TVPA claim should be raised in a motion filed under Rule 12(b)(6), rather than 12(b)(1)." *Id.* (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 96 (1998)). The Court thus considers whether Plaintiffs have stated a

claim under the TVPA, not whether the Court has jurisdiction to hear Plaintiffs' TVPA claims.[12]

The parties disagree over both the legal elements of an action brought under the TVPA and whether Plaintiffs have sufficiently alleged a violation of the statute.  Chapman argues Plaintiffs must allege, "Chapman was a 'state actor' or was sufficiently connected to the Cuban government to be acting under color of law."  (Mot. Dismiss 18 (citing 28 U.S.C. § 1350 note § 2(a))).  Similar to their arguments made under the ATS, Plaintiffs contend the Eleventh Circuit permits Plaintiffs to allege Chapman is secondarily liable under the TVPA, and, as a result, "[t]he state action requirement of the TVPA is satisfied by the fact that the individuals subjecting Plaintiffs to torture are the prison guards and officers of the Cuban government."  (MTD Resp. 17).

Chapman urges the Court to follow a recent decision from the Southern District of Texas that rejects secondary liability under the TVPA.  (*See* MTD Reply 9 (citing *Weisskopf v. United Jewish Appeal-Fed'n of Jewish Philanthropies of N.Y., Inc.*, No. H-12-130, 2012 WL 3686692, at *8 (S.D. Tex. Aug 22, 2012) ("Even if Defendants could be sued under the TVPA, Plaintiff's Complaint still fails to state a claim because that statute does not permit liability for aiding and abetting a primary violator.") (citations omitted))).  However, Chapman has not provided any additional analysis why the Court should break from a long line of Eleventh Circuit cases that recognize secondary liability under the TVPA.  *See, e.g., Cabello*, 402 F.3d at 1157 ("An examination of legislative history indicates that the TVPA was intended to reach beyond the person who actually committed the acts, to those ordering, abetting, or assisting in the violation.") (citations omitted); *Romero*, 552 F.3d at 1315–16; *Sinaltrainal*, 578 F.3d at 1270;

---

[12]   In the Motion to Dismiss, Chapman argues the Court lacks jurisdiction over Plaintiffs' TVPA claims because the Court is empowered to entertain TVPA claims only if the ATS provides jurisdiction.  (*See* Mot. Dismiss 18 (citations omitted)).  At the October 31 Hearing, Chapman conceded Plaintiffs may assert jurisdiction under 28 U.S.C. section 1331.

*see also Baloco ex rel.*, 640 F.3d at 1345–50.

The Court is "bound by [the Eleventh Circuit's] decision in *Cabello*," and Plaintiffs may state a cause of action under the TVPA based on secondary liability. *Romero*, 552 F.3d at 1316. To state a claim under the TVPA, Plaintiffs must allege: (1) the individuals who tortured Curbelo Garcia and Perdomo were state actors or acted under color of law; and (2) Chapman conspired with or aided and abetted those actors in carrying out the state-sponsored torture. *See In re Chiquita*, 792 F. Supp. 2d at 1354 (quoting *Sintrainal*, 578 F.3d at 1270).[13]

With respect to the first element, Plaintiffs allege their torture was "conducted by government officials, prison guards, and DCSE investigators." (Am. Compl. ¶¶ 337, 368). Chapman does not — and, indeed, could not — contend that Cuban government officials, prison guards and DCSE investigators are not state actors. The Court thus concludes Plaintiffs sufficiently allege state action under the TVPA.

The elements of conspiracy and aiding abetting under the TVPA are the same as under the ATS. *See Cabello*, 402 F.3d at 1158–59 (discussing secondary liability elements under both the ATS and the TVPA). For the same reasons that Plaintiffs state a claim of conspiracy under the ATS, Plaintiffs also state a claim of conspiracy under the TVPA.[14] *See In re Chiquita*, 792 F. Supp. 2d at 1354 (rejecting identical arguments made under the ATS and TVPA). As a result, the Court does not address aiding and abetting under the TVPA.

---

[13]  The Eleventh Circuit has recognized the "TVPA differs from the ATS in certain crucial ways," *Baloco ex rel.*, 640 F.3d at 1345, including "[t]hat the TVPA and ATS employ different definitions of 'torture,'" *id.* at 1346. Chapman does not dispute whether Plaintiffs have adequately alleged torture under either the ATS or the TVPA.

[14]  The TVPA additionally requires that a "court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." Torture Victim Protection Act § 3(b). At the October 31 Hearing, Chapman conceded Plaintiffs have sufficiently alleged they exhausted adequate and available remedies in Cuba for the purposes of the Motion to Dismiss.

### 3. Practical Considerations

#### a. Political Question Doctrine

Chapman argues the Amended Complaint presents nonjusticiable political questions under Supreme Court precedent.  (*See* Mot. Dismiss 26–29 (citing *Baker v. Carr*, 369 U.S. 186, 216–17 (1962))).  "The nonjusticiability of a political question is primarily a function of the separation of powers," and invokes the "appropriateness under our system of government of attributing finality to the action of the political departments."  *Baker v. Carr*, 369 U.S. 186, 210 (1962) (internal quotation marks and citation omitted); *see also* BLACK'S LAW DICTIONARY (9th ed. 2009) ("[P]olitical-question doctrine. The judicial principle that a court should refuse to decide an issue involving the exercise of discretionary power by the executive or legislative branch of government.").  The Supreme Court has enumerated six factors that establish the contours of the political question doctrine, including "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made."  *Baker*, 369 U.S. at 217.  "Unless one of [the six factors] is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence."  *Id.*

Chapman points to the robust history of the executive and legislative branches' management of the nation's relationship with Cuba (*see* Mot. Dismiss 21–26), and concludes "[i]n light of the active role the executive and legislative branches play in managing this complex political arena . . . this Court should not involve itself in the relations between these two countries by adjudicating this case." (MTD Reply 11).  Plaintiffs contend that although their claims may arise in a "politically charged context," that does not convert their "ordinary tort suit

into a non-justiciable political question."  (MTD Resp. 25 (quoting *Linder v. Portocarrero*, 963 F.2d 332, 337 (11th Cir. 1992))).  Plaintiffs further assert courts have regularly refused to dismiss ATS and TVPA cases in response to arguments that such cases present nonjusticiable political questions, even when the U.S. Department of State has issued statements of interest, which the Department of State has not done here.  (*See id.* 26 (citing *In re Chiquita*, 2001 WL 2163973, at *16; *In re S. African Apartheid Litig.*, 617 F. Supp. 2d 228, 277–86 (S.D.N.Y. 2009); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, No. 01 Civ.9882(DLC), 2005 WL 2082846, at *1 (S.D.N.Y. Aug. 30, 2005))).

Chapman attempts to distinguish this case from those cited by Plaintiffs by classifying the "violations of international norms [in those cases, unlike here,]" as "undeniable."  (MTD Reply 11 (citing cases)).  As discussed, Chapman's emphasis on the facts pertaining to his provision of false accusations and false testimony misses the mark.  The viable claims arise from the prolonged arbitrary detentions and torture of Curbelo Garcia and Perdomo, for which Plaintiffs allege Chapman is secondarily liable.  Viewing Plaintiffs' claims in this manner, in other words, viewing the claims in the light most favorable to Plaintiffs, the Cuban government's alleged violations of international law are similarly "undeniable" and Chapman's argument fails.

Importantly, Plaintiffs' claims do not require the Court to render judgments regarding any current or past policies of the United States toward Cuba.  *See Presbyterian Church of Sudan*, 2005 WL 2082846, at *5.  Moreover, it is "telling that the United States has not advised [the] Court that the continuation of this lawsuit will adversely affect the Government's relations" with Cuba.  *Id.* at *6.  Indeed, the "[t]he United States was not directly or indirectly involved in any of the events" alleged in the Amended Complaint.  *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 756 (9th Cir. 2011).  Just as other courts have regularly entertained claims under the ATS and TVPA that

involve significant foreign relations issues, *see In re Chiquita*, 792 F. Supp. 2d at 1322–23 (citing cases), the Court finds no persuasive reason why this case presents nonjusticiable political questions.

### b. Act of State and International Comity Doctrines

Chapman next argues the act of state doctrine and principles of international comity require that the Court dismiss the case.  (*See* Mot. Dismiss 29, 31).  Plaintiffs maintain the act of state and international comity doctrines are discretionary, and neither weighs in favor of the Court declining jurisdiction here.  (*See* MTD Resp. 27–28).

Regarding the act of state doctrine, Chapman asserts the Court cannot "inquir[e] into the validity of a recognized foreign sovereign's public acts committed within its own territory." (Mot. Dismiss 29 (quoting *Fogade v. ENB Revocable Trust*, 263 F.3d 1274, 1293 (11th Cir. 2001))).  The act of state doctrine "precludes any review whatever of the acts of the government of one sovereign State done within its own territory by the courts of another sovereign State.  It is clear, however, from both history and the ipinions [sic] of [the Supreme] Court that the doctrine is not an inflexible one."  *First Nat. City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 763 (1972).  Although the doctrine is not inflexible, *jus cogens* norms, which are afforded the highest status under international law, are exempt from the act of state doctrine because they "constitute norms from which no derogation is permitted."  *Sarei*, 671 F.3d at 757 (internal quotation marks and citations omitted).  State torture violates such a *jus cogens* norm.  *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 717 (9th Cir. 1992) ("Given this extraordinary consensus, we conclude that the right to be free from official torture is fundamental and universal, a right deserving of the highest status under international law, a norm of *jus cogens*. . . . That states engage in official torture cannot be doubted, but all states believe it

is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its own citizens."). There is support that prolonged arbitrary detentions likewise violate *jus cogens* norms. *See* Restatement (Third) of Foreign Relations Law § 702, comment n (1987) ("Not all human rights norms are peremptory norms (jus cogens), but those in clauses (a) to (f) of this section [, which include prolonged arbitrary detention,] are, and an international agreement that violates them is void."). "Thus, Plaintiffs' claims that allege *jus cogens* violations are not barred by the act of state doctrine." *Sarei*, 671 F.3d at 757.

Chapman maintains principles of international comity call for dismissal, as the exercise of jurisdiction in this case is unreasonable under the Restatement (Third) of Foreign Relations Law. (*See* Mot. Dismiss 31–32 (citing Restatement (Third) of Foreign Relations Law § 403(2))). The comity doctrine "is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). The Court finds the "multiple concerns animating the comity doctrine," on balance, do not bar Plaintiffs' claims. *Sarei*, 671 F.3d at 757. In order for Chapman to properly invoke the doctrine of international comity, he must "point to a legal proceeding in [Cuba] involving these particular plaintiffs to which the court must defer or at least the availability of effective and non-futile local remedies." *Exxon Mobil*, 654 F.3d at 64 (citing *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 454 (2d Cir. 2001)). Chapman has done neither in relation to Curbelo Garcia and Perdomo's alleged prolonged arbitrary detentions and torture. As a result, the Court will not decline jurisdiction in this case.

### c. Availability of Evidence

Chapman next argues this case is analogous to "state secrets cases where federal courts

have dismissed cases on the basis that evidence necessary to litigate is unavailable." (Mot. Dismiss 33 (citing *El Masri v. United States*, 479 F.3d 296, 309 (4th Cir. 2007); *Zuckerbraun v. Gen. Dynamics Corp.*, 935 F.2d 544, 547 (2d Cir. 1991))). Chapman asserts Plaintiffs will be unable to "produce evidence to show that Chapman was responsible for their treatment and incarceration" (*id.* 34), and likewise Chapman will not have access to evidence necessary to defend his case (*see id.* 35).

According to Plaintiffs, "neither the United States nor any [other] country has claimed the state secrets doctrine, which would preclude discovery of evidence. In fact, the evidence central to the case is made up of Cuban public records, which are readily available." (MTD Resp. 31–32). Plaintiffs insist their claims "can be established and ably defended by the use of Cuban public records and witness testimony, not by state secrets or unattainable evidence hidden within the Cuban government." (*Id.* 32).

Chapman's argument fails to persuade. No country is refusing to disclose evidence pursuant to the state secrets doctrine. In fact, Chapman's argument would appear to effectively bar ATS and TVPA claims because state action is a necessary element of most ATS claims and all TVPA claims. This cannot be the proper outcome, particularly given the long line of cases that has proceeded past the motion to dismiss stage despite presenting significant hurdles to the parties' ability to collect evidence. *See, e.g.*, *Romero*, 552 F.3d at 1310–13 (detailing the plaintiffs' extensive trouble in procuring evidence). The Court will not decline jurisdiction based on Chapman's claimed inaccessibility to evidence.

### 4. State Law Claims

Chapman argues Counts III and IV of the Amended Complaint, for loss of consortium and loss of parental consortium, respectively, are "dependent on [Curbelo Garcia's] tort claims

and cannot survive in the absence of a cognizable tort under either act." (Mot. Dismiss 35). Because Curbelo Garcia's ATS and TVPA claims may proceed, the Court will not dismiss Counts III and IV.

### III.  Motion to Strike

#### A.  Legal Standard

Federal Rule of Civil Procedure 8(d) requires that "[e]ach allegation must be simple, concise and direct." FED. R. CIV. P. 8(d). Federal Rule of Civil Procedure 12(f), in turn, provides "[u]pon motion made by a party . . . the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Id.* 12(f). Nevertheless, "a court will not exercise its discretion under [Rule 12(f)] to strike a pleading unless the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *Reyher v. Trans World Airlines, Inc.,* 881 F. Supp. 574, 576 (M.D. Fla. 1995) (citations omitted). Indeed, "[m]otions to strike generally are disfavored and will usually be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Merrill Lynch Bus. Fin. Servs., Inc. v. Performance Mach. Sys. U.S.A., Inc.,* No. 04–60861-CIV-MARTINEZ, 2005 WL 975773, at *11 (S.D. Fla. March 4, 2005) (internal quotation marks and citations omitted); *see also* Wright & Miller, *supra*, § 1382 ("Rule 12(f) motions to strike . . . are not favored, often being considered purely cosmetic or 'time wasters,'" and are regularly "denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of significant prejudice to one or more of the parties to the action." Further, "[a]ny doubt about whether the challenged material is redundant, immaterial, impertinent, or scandalous should be resolved in favor of the non-moving party.")

(footnote call numbers omitted).

### B. Analysis

Chapman moves the Court to strike paragraphs 150 through 297 and Exhibits D, H through U, and W through Y of the Amended Complaint. (*See* Mot. Strike 2 n.1). In support, he argues the paragraphs and exhibits amount to "immaterial and irrelevant allegations which have no bearing on the case at hand" (*id.* 1), and "are so prolix and irrelevant that it would be difficult, if not impossible, for Chapman to respond to them" (*id.* 3). Chapman further asserts the Court should strike each paragraph and exhibit because the allegations contained therein are not directly related to Plaintiffs' alleged injuries and concern behavior of irrelevant third parties. (*See id.* 4 (citing *Bretifeller v. Playboy Entm't Grp., Inc.*, No. 8:05CV405T30TGW, 2005 WL 2088418, at *6 (M.D. Fla. Aug. 30, 2005))).

Plaintiffs insist the voluminous pleadings "establish the background, environment, Cuban judicial system, Cuban criminal procedures and laws and the totality of the circumstances in which [Chapman] acted in order to further [his] conspiracy and/or aid and abet the Cuban government in the arbitrary prolonged detention and torture of Plaintiffs." (Strike Resp. 5). Pointing to the complaints in *In re Chiquita*, in which the plaintiffs included a history of the Colombian Civil War and reports of the Department of State and Human Rights Watch, Plaintiffs conclude it is appropriate to include similar allegations in the Amended Complaint. (*See id.*). Plaintiffs further suggest Chapman need not investigate Cuban law and policy to respond to the Amended Complaint, but can instead "neither admit nor deny those allegations due to insufficient knowledge." (*Id.* 6).

At the October 31 Hearing, Chapman's counsel advised that a detailed review of the pleadings was done to confirm the paragraphs included in the Motion to Strike should be

stricken.   Yet, despite Chapman bearing the "burden on a motion to strike [as the] moving party," *Millar v. Lakin Law Firm, P.C.*, No. 09-cv-101-JPG, 2009 WL 1209052, at * 1 (S.D. Ill. Apr. 30, 2009), Chapman provided no such searching, paragraph-by-paragraph analysis to the Court.   Similarly, the eighteen purportedly offending exhibits are not analyzed in any detail. Although the Court agrees that many allegations, such as those concerning individuals wholly unrelated to the instant case, "have no possible relation to the controversy," *Merrill Lynch*, 2005 WL 975773, at *11 (internal quotation marks and citations omitted), the Court cannot conclude that all of the paragraphs and exhibits at issue, in their entirety, are "prejudicial or completely irrelevant."  *Millar*, 2009 WL 1209052, at *1.

Chapman additionally moves the Court to strike paragraphs 374 through 385, which encompass Plaintiffs' request for the Court to take judicial notice of various exhibits.  (*See* Mot. Strike 4).  Chapman argues, "[b]y definition, judicial notice is evidentiary in nature.  It is not part of the initial pleading stage of a lawsuit."  (*Id.*).  Plaintiffs explain that their request for judicial notice, contained in their pleading, relies on Federal Rule of Evidence 201(d), under which "the court may take judicial notice at any stage of the proceeding."  (Strike Resp. 6).  The Court agrees with Chapman.  A request that the Court take judicial notice of a fact is a request directed to the Court; it is not an allegation by Plaintiffs against Defendants intended to state a legal claim.  *See* FED. R. CIV. P. 8.  Consequently, paragraphs 374 through 385 are stricken.  Plaintiffs may move the Court to take judicial notice in an appropriate filing.

### IV.  Motion to Drop Plaintiff Carlos Rafael Mena Perdomo

#### A.  Legal Standard

Federal Rule of Civil Procedure 21 provides, in part, "[m]isjoinder of parties is not a ground for dismissing an action.  On motion or on its own, the court may at any time, on just

terms, add or drop a party." FED. R. CIV. P. 21.  The decision of whether to drop a party from a case pursuant to Rule 21 "is left to the sound discretion of the trial court."  *Wright v. Burkhead*, No. 6:07-cv-2039-Orl-19KRS, 2008 WL 423452, at *4 (M.D. Fla. Feb. 13, 2008) (citing *Lampliter Dinner Theater, Inc. v. Liberty Mut. Ins. Co.*, 792 F.2d 1036, 1045 (11th Cir. 1986)). "While Rule 21 contemplates dropping parties at any stage of the proceedings 'on such terms as are just' and is addressed to the court's discretion, application of the rule is premised upon a defect of parties."  *United States v. D. I. du Pont de Nemours & Co.*, 13 F.R.D. 490, 494 (N.D. Ill. 1953).

To determine whether there is a defect of joined plaintiffs, the Court looks to Federal Rule of Civil Procedure 20(a), which permits multiple plaintiffs to join in one action if: "(A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all plaintiffs will arise in the action."  FED. R. CIV. P. 20(a).  Thus, two conditions must be met for plaintiffs to be properly joined: "(1) a right to relief arising out of the same transaction or occurrence, or series of transactions or occurrences, and (2) some question of law or fact common to all persons seeking to be joined."  *Alexander v. Fulton Cnty., Ga.,* 207 F.3d 1303, 1323 (11th Cir. 2000), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003).  Because the purpose of Rule 20 is for courts to entertain "the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged."  *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 724 (1966). "Accordingly, all logically related events entitling a person to institute a legal action against another generally are regarded as comprising a transaction or occurrence."  *Alexander*, 207 F.3d at 1323 (internal quotation marks omitted) (quoting *Mosley v. General Motors Corp.,* 497 F.2d

1330, 1333 (8th Cir. 1974)).

### B.  Analysis

In urging the Court to drop Perdomo from the Amended Complaint, Chapman points to Rule 20(a) and argues Curbelo Garcia and Perdomo's claims do not arise out of the same transaction or occurrence, or series of transactions or occurrences.  (*See* Mot. Drop 4–5). Chapman contends Perdomo and Curbelo Garcia's claims are not rationally related because they arise out of separate meetings with Chapman, are based on separate arrests and detentions, involve separate trials and witnesses, and involve unrelated prison conditions and treatment by prison guards.  (*See id.* 5).  Chapman relies on *Insolia v. Philip Morris Inc.*, 186 F.R.D. 547 (W.D. Wis. 1999), for the proposition that alleging conspiracy is insufficient to allow Curbelo Garcia to join Perdomo as a plaintiff.  (*See* Drop Reply 2).  Chapman does not address the second prong of permissive joinder.

Plaintiffs maintain Perdomo and Curbelo Garcia's claims are not as different as Chapman suggests.  Plaintiffs assert the claims arise from a single conspiracy between Chapman and the Cuban government whereby Chapman falsely accused individuals, including Perdomo and Curbelo Garcia, who the Cuban government then detained and tortured.  (*See* Drop Resp. 2). Plaintiffs insist similarities between Perdomo and Curbelo Garcia's claims abound: Plaintiffs were the victims of similar false accusations, namely that each offered to smuggle Chapman out of Cuba, via Havana and a waiting speed boat, to play baseball for millions of dollars; Chapman accused both men only days apart; each was arrested the day after Chapman reported his accusations; each was subjected to similar prolonged and arbitrary detentions and torture; the trials for Perdomo and Curbelo Garcia were scheduled for the same day in the same court, but

Perdomo was too ill to be transferred on that day; and when Perdomo's health improved, he was tried in the same court as Curbelo Garcia had been.  (*See id.* 2–3; Oct. 31 Hr'g).

The Court is persuaded that Curbelo Garcia and Perdomo's claims are logically related and therefore arise out of the same transaction, occurrence, or series of transactions or occurrences.  *See Alexander*, 207 F.3d at 1323.  Plaintiffs have alleged a broad conspiracy in which Chapman provided the Cuban government with similar false accusations and testimony against Curbelo Garcia and Perdomo, which resulted in similar prolonged arbitrary detentions and torture.  In contrast, the "only thread" holding the plaintiffs' claims together in *Insolia* was the charge of conspiracy.  *Insolia*, 186 F.R.D. at 549.  Here, that is not the case.  Moreover, the interests of judicial economy are best served by allowing Curbelo Garcia and Perdomo's claims to proceed together.

Furthermore, although Rule 21 generally requires leave of court before a party may add or drop parties, the Court may, on its own initiative, permit the addition of a plaintiff even after a plaintiff is added to a complaint without leave of court.  *See* FED. R. CIV. P. 21; *Zarate v. State Dept. of Health and Rehabilitative Servs.*, 347 F. Supp. 1004, 1006 (S.D. Fla. 1971) (citations omitted); *Soler v. G & U, Inc.*, 86 F.R.D. 524, 528 n.3 (S.D.N.Y. 1980) (citing *Zarate*, 347 F. Supp. at 1006).  Plaintiffs added Perdomo in the Amended Complaint without first seeking leave of Court under Rule 21 to do so.  Yet, having determined Curbelo Garcia and Perdomo's claims are logically related and the interests of judicial economy are best served by allowing the claims to proceed together, the Court will exercise its discretion and allow Plaintiffs to proceed together in a single complaint.  *See Zarate*, 347 F. Supp. at 1006.

## V.  Conclusion

For the foregoing reasons, it is

12-21891-CV-ALTONAGA/Simonton

**ORDERED AND ADJUDGED** as follows:

1. The Motion to Dismiss **[ECF No. 55]** is **DENIED**.

2. The Motion to Strike **[ECF No. 56]** is **GRANTED in part**.

3. The Motion to Drop **[ECF No. 57]** is **DENIED**.

**DONE AND ORDERED** at Miami, Florida, this 28th day of November, 2012.

_Cecilia M. Altonaga_
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record